## County Commissioner Substitute Nomination Case.

Submitted October 31, 1955. Before STERN, C. J., STEARNE, JONES, BELL, MUSMANNO and ARNOLD, JJ.

*Charles E. Kenworthey, Walter T. McGough, J. Tomlinson Fort* and *Reed, Smith, Shaw & McClay,* for appellant.

*David Olbum* and *Philip Baskin,* for appellee.

ORDER PER CURIAM, October 31, 1955:

The Court is unanimously of opinion that the order of the Court below should be affirmed.

Order affirmed and supersedeas heretofore granted vacated; opinion to be filed later.

———

OPINION BY MR. CHIEF JUSTICE HORACE STERN, December 15, 1955:

Harry W. Fowler was nominated on the Democratic ticket for the office of County Commissioner of the

County of Allegheny at the primary election held May 17, 1955. He died on October 24, 1955. On the following day the Executive Committee of the Democratic Party in Allegheny County, in accordance with party rules, designated Howard B. Stewart as a substitute nominee in place of Fowler. The printing of the ballots and voting machine ballot labels for the municipal election on November 8, 1955, had been started on October 5 and completed on October 25, with Fowler's name thereon as one of the Democratic candidates for the office of County Commissioner.

Stewart presented a petition to the Court of Common Pleas of Allegheny County praying that the Allegheny County Board of Elections be directed to accept the substitute nomination certificate of the Democratic Executive Committee of Allegheny County, and to proceed forthwith to make the necessary substitution in the paper ballots and the voting machine ballot labels as well as in the veterans' ballots. Hearing having been had, the Court of Common Pleas entered an order granting the relief requested.* An appeal was forth-

---

\* The order of the court below was as follows:

"AND Now, to-wit, October 28, 1955, the petition filed at the above number and term having been presented in open court, it appearing that notice of the presentation thereof was given to Edward L. Flaherty, Chairman of the Republican County Committee of Allegheny County, and to John M. Walker and John M. Kane, nominees of the Republican Party for the office of Commissioner of Allegheny County, the parties being present in court and represented by counsel, a full hearing was held this date, and after due consideration of the testimony and the argument of counsel, the prayer thereof is hereby granted and it is ordered and decreed that the Board of Elections of Allegheny County accept and file the substitute nomination certificate of the Democratic County Executive Committee nominating Howard B. Stewart in place of Harry W. Fowler, now deceased, as a Democratic candidate for the office of Commissioner of Allegheny County, for the Municipal Election to be held November 8, 1955.

with taken to this Court. We affirmed the order of the Court below and stated that an opinion would be filed later.

Section 979 of the Election Code of June 3, 1937, P. L. 1333, as amended by the Act of May 6, 1943, P. L. 196, provides: "Any vacancy happening or existing after the date of the primary in any party nomination, by reason of the death or withdrawal of any candidate after nomination, . . . may be filled by a substituted nomination made by such committee as is authorized by the rules of the party to make nominations in the event of vacancies of the party ticket: . . . ."

Section 981(b) of the Election Code provides: "Substituted nomination certificates to fill vacancies caused by the death of candidates nominated at pri-

"It is further ordered that said County Board of Elections proceed forthwith to substitute the name of Howard B. Stewart by applying over the office block of County Commissioner printed on the paper ballots, stickers for said office block bearing the printed names of John J. Kane and Howard B. Stewart as candidates of the Democratic party, and of John M. Walker and John M. Kane as candidates of the Republican party for said office, and on the voting machine ballot labels by applying stickers bearing the printed name of Howard B. Stewart over the name of Harry W. Fowler, and on the various return papers by likewise applying stickers bearing the printed name of Howard B. Stewart over the name of the said Harry W. Fowler, now deceased.

"It is further ordered that military and veterans' ballots for said election be corrected in like manner so as to include said substituted nominee, and that said ballots be mailed or delivered promptly to military electors and hospitalized veterans in accordance with the provisions of the Election Code; that with respect to military and veteran voters who have already voted, or to whom ballots have been mailed prior to the date of this Order, such original ballots which have been or will be received by the County Board be set aside and retained by said Board, to be counted only in the event that the corrected ballot mailed or delivered to such voters pursuant to this Order is not received by the County Board before 10 o'clock A.M. on November 18, 1955."

maries or by nomination papers shall be filed at the proper office at any time prior to the day on which the printing of ballots is started."

Section 1006 of the Election Code provides: "As soon as any substituted candidate shall have been duly nominated, at any time prior to the day on which the printing of ballots is started, his name shall be substituted in place of that of the candidate who has died or withdrawn."

In the instant case not only had the ballots been printed but the military ballots had actually been mailed prior to Fowler's death. Appellants insist that the aforesaid provisions in reference to the time limit in which the substituted nomination certificates may be filed, or the name of the substituted candidate be substituted in place of the candidate who has died or withdrawn, namely, prior to the day on which the printing of ballots is started, are mandatory; appellees, on the other hand, contend that they are merely directory and that the purpose and spirit of the election laws is to enable citizens to vote for a live candidate of their choice.

The record shows that the printing of the ballots could, as a practical matter, and within the requirements of the law, have been commenced in Allegheny County at any time between September 27th and October 21st. The Election Code does not fix a specific number of days prior to the election as the time at which such printing must or should be started. It is impossible to believe that the Legislature intended that the mere caprice of the County Commissioners as to when the printing of the ballots should be started, or the illness, volume of accumulated business, whims or intentions of a printer, should determine whether the voters of a county should have the right to vote for a living candidate of their party who was nominated in

the manner prescribed in the Code. Ballots in some counties can obviously be printed and be ready for distribution much more quickly than in others. That there is *some* necessary time limit appears from section 982 of the Election Code, since it provides that objections to a substituted nomination certificate must be filed within three days, and with the Court of Common Pleas thereafter acting upon such objections.

The Election Code comprises, exclusive of amendments, over 200 pages, and it is perhaps inevitable that it should contain some ambiguities and inconsistencies; where that occurs, all of the relevant sections of the Act, as well as its purpose, object and intent, must be considered in construing any part which may be obscure. The sections to which we have referred must be given a reasonable and practical rather than an intensely narrow, literal construction. Consequently, they are to be construed as being merely directory, not mandatory, and as meaning that a substituted nomination for a *deceased* candidate may be made so long as time permits for the correction of the ballots accordingly. The question does not arise with respect to a substituted nomination for a vacancy created by the *withdrawal* of a nominee. Sections 978 and 981 (a) of the Election Code, as amended, specifically apply to such a contingency.

It was for these reasons that we held that the substituted nomination certificate of the Executive Committee of the Democratic Party was filed legally in time to permit the name of Howard B. Stewart to be placed on the ballot as a nominee for the office of County Commissioner of the County of Allegheny, and that we therefore affirmed the order of the court below.

CONCURRING OPINION BY MR. JUSTICE MUSMANNO:

Harry W. Fowler, County Commissioner of Allegheny County, died on October 24, 1955, after having been nominated May 17, 1955, on the Democratic ticket, to succeed himself in that office. The Pennsylvania Election Code provides that where death creates a vacancy in a party nomination, the party, through its appropriate committee, may choose a substitute nominee. On October 26, 1955, the Democratic Party, under prescribed party rules, made the nomination, selecting Howard B. Stewart to take Fowler's place.

On October 27th Howard B. Stewart requested the Court of Common Pleas of Allegheny County to direct the Allegheny County Board of Elections to accept the substitute nomination certificate and provide the necessary machinery for the substitution of his name on the ballots.* At a hearing before President Judge Mc-NAUGHER and Judges O'BRIEN and DUFF, the Director of the Department of Elections of Allegheny County, Will E. Alton, testified that the substitution of name could be made by means of a printed sticker. It was shown that this procedure had been followed in the 1947 elections when John J. Exler took the place of Anthony J. Gerard, Democratic nominee for Recorder of Deeds, who had died ten days prior to the election, and in 1943 when the name of Walter P. Smart displaced that of Judge RALPH H. SMITH, who died following his nomination at the Democratic primary that year.

There was thus sufficient precedent to authorize the granting of Stewart's request. One barrier appeared in the path of the allowance of the petition. Section 981(b) of the Election Code provides: "Substituted

---

* I use "ballots" in the generic sense, including in the term voting machine labels as well.

nomination certificates to fill vacancies caused by the death of candidates nominated at primaries or by nomination papers shall be filed at the proper office at any time prior to the day on which the printing of ballots is started." Interpreted literally, this provision would mean that the sticker substitution could not be accomplished because the printing of the ballots was already finished as of October 25, 1955, two days before the petition was filed. Eleven days, however, yet remained before election day, ample time within which to print the stickers and attach them to the ballots.

If the literal interpretation was to prevail, and the substitution by sticker was to be prohibited, a most anomalous and even grotesque situation would result. It would compel those who believed that the administration of the Allegheny County government should be entrusted to the Democratic Party to vote for one live man and one dead man—and this, in spite of the fact that a substitute live man was already standing by, qualified for the race in which the deceased Mr. Fowler had fallen. Was the law to be regarded so inadequate and incapable of reflection as to insist that the lifeless runner continue on the course?

Death is not a mere happenstance. It comes to all. It is only the date of its occurrence which is indefinite. A factor which must be considered in the planning of any project is the possibility that death may interfere with or interrupt the normal sequence of events. Thus, a president must have his vice-president, a governor his lieutenant governor, and every leading actor must train an understudy because Death is always waiting in the wings of the stage, ready to stalk out unannounced on the stage of reality. The cry of "The King is dead, Long live the King!" had reason and logic to support it, namely, that the sceptre of government was not to be buried in the coffin of him who held it last,

but to be gripped at once by the new monarch, so that government would reign unimpeded and authority march on unbroken. In a democracy, this need for continuity of office is even more pronounced. It must, then, be taken for granted that when the Legislature addressed itself to the subject of death in the Election Code it intended to provide the machinery which would supply in all instances living candidates for dead candidates, when time permitted of the substitution.

It is to be noted that the Legislature did *not prohibit* the filing of substituted nomination certificates after the beginning of the ballot printing. If that had been its intention, it could quite easily have said so. In declaring that the substitution was to be made prior to the printing of the ballots, it was merely announcing a policy of convenience and prudence. It was perhaps assumed that a change in the names of candidates might necessitate a re-printing of the entire ballot, which, of course, would involve a considerable expenditure of time and money. The printing of a sticker, however, is entirely a different matter, one of comparatively small expense and easily accomplished within the scope of time ordinarily allotted to the job of the whole printing. Certainly the Legislature did not intend any provision of the Election Code to prevent the correction of a ballot, by sticker or otherwise, where a printing error might have occurred. And if there would be the right, which of course there would be, to correct a misspelling, a fortiori there would be the right and duty to make a change made necessary by the intervention of death.

The whole question in this case is whether the instruction in Section 981(b) of the Election Code was a mandate or a direction. In solving this question we are not left to logic alone, as formidable as such a pillar would be in upholding the conclusion which this

Court now reaches. There is stare decisis to lend its powerful strength in sustaining the decision which logic and common sense dictate. In 1908 this Court said in the case of *Coolbaugh v. Herman,* 221 Pa. 496, 502: "When a statute directs certain proceedings to be done in a certain way, or *at a certain time* the law will be regarded as directory and the proceedings under it will be held valid, though the command of the statute as to form and time has not been strictly obeyed; the time and manner not being the essence of the thing required to be done."* Was the time of what was to be done here "the essence of the thing required to be done"? I do not believe so, for otherwise the Legislature would not have left to the county commissioners, on a sliding schedule, the beginning of the printing *any time* between September 27th and October 21st.

The authors of the Election Code patently intended to make full provision for the contingency of death of candidates occurring between the primaries and the general elections. In *McQuiston's Adoption,* 238 Pa. 304, 309, we said: "It is a settled rule that in the construction of statutes an interpretation is never to be adopted that would defeat the purpose of the enactment, if any other reasonable construction can be found which its language will fairly bear. If, therefore, it appears that by construing the language of the act in the particular referred to as mandatory, the purpose of the act would be so seriously impaired as to amount to a defeat in purpose; while, on the other hand, if construing it as simply directory its efficiency is preserved, the latter construction is to prevail."

In *Cowan's Estate,* 184 Pa. 339, which had to do with the time of filing certain claims against an estate, this Court said: "Q. . . . 'There is an established prin-

---

* All italics, mine.

ciple that where as here the thing to be done may well be done after as before the time prescribed, where it is a matter of manner, order or convenience, rather than of substance, the courts assume the legislative intent to have been merely directory: Dwarris on Statutes, 222.' ''

In the *Kohn Election Case,* 351 Pa. 544, we said that statutory limitations "are not conclusive when good cause is shown." The very purpose of election laws is to secure "freedom of choice and to prevent fraud and corruption; to obtain a fair election and an honest election return; to insure fair elections, or an equal chance and opportunity for everyone to express his choice at the polls; and to secure the rights of duly qualified electors and not to defeat them. *The election laws should not be so interpreted as to defeat the very object of their enactment.* Election laws are sui generis. Laws regulating the rights of an elector are merely directory."*

Courts are established by the people to do justice. Although the rank and file of the population are unfamiliar with the technical aspects of jurisprudence, there are certain elementary principles of law which require no more explanation than the Ten Commandments. That candidates for office should be living persons is about as fundamental a proposition as could be stated in any primer on government. Since the representatives of the people in General Assembly have already built a bridge over which any political party may carry forward its program to fulfillment undeterred by death, it would be a folly incomprehensible to the people to hold that the absence of one rivet or bolt in that bridge should condemn it and prohibit the trifling repair.

---

* Corpus Juris Secundum, Vol. 29, §7, p. 27.

To deny the people the opportunity to vote for living candidates where it is obviously possible to do so is not to uphold the Election Code but to make a mockery of it. "No statute regulating the conduct of elections should be so construed as to place arbitrary or unreasonable obstructions in the way of a citizen in the exercise of his right to vote."*

The Statutory Construction Act of Pennsylvania (46 PS §501 et seq.) declares that one of the rules which must be followed in determining the intent of the Legislature is: "That the Legislature does not intend a result that is absurd, impossible of execution, or unreasonable": Sec. 52 (1), 46 PS §552 (1).

It obviously requires very little reflection to come to the conclusion that to demand that the people vote on a dead candidate when a live person is available and qualified under the law is absurd and unreasonable.

The decision of the lower Court, affirmed by this Court, to authorize the substitution of the name of Howard B. Stewart for that of the late Harry W. Fowler, was not only reasonable but it had the additional laudatory effect of increasing a respect for the law and the courts, without which the robe would be but meaningless trappings and the courthouse only an object of architectural curiosity along the dusty highway of life.

---

* Corpus Juris Secundum, Vol. 29, §191, p. 277.