Allegheny County, Appellant, *v.* Pennsylvania Public Utility Commission.

102

Argued December 18, 1959. Before RHODES, P. J., GUNTHER, WRIGHT, WOODSIDE, ERVIN, and WATKINS, JJ. (HIRT, J., absent).

*Maurice Louik*, County Solicitor, with him *Arthur L. McLaughlin, III*, Assistant County Solicitor, and *James B. Wallace*, solicitor for Controller of Allegheny County, for County of Allegheny, appellant.

*Miles Warner*, Assistant Counsel, with him *Thomas M. Kerrigan*, Counsel, for Pennsylvania Public Utility Commission, appellee.

*J. Tomlinson Fort*, with him *Carl E. Glock*, and *Reed, Smith, Shaw & McClay*, for utility company, intervenor.

OPINION BY WRIGHT, J., March 24, 1960:

On October 15, 1956, the Carnegie Natural Gas Company, hereinafter referred to as Carnegie, applied to the Pennsylvania Public Utility Commission for nunc pro tunc approval of an agreement dated August 13, 1929 between Carnegie and the County of Allegheny.

On November 13, 1956, on its own motion, the commission instituted a proceeding "to determine the reasonableness, legality, and or any other matter affecting the validity of the agreement". On January 17, 1957, there was a hearing before the commission's examiner at which time Carnegie introduced testimony, and the county moved to dismiss the proceeding. The examiner refused this motion, continued the hearing, and suggested that the county file with the commission a petition for dismissal. Such a petition was filed by the county on February 27, 1957, to which petition, on March 4, 1957, Carnegie filed an answer. On September 16, 1957, the commission denied the petition for dismissal without prejudice, and directed that the matter be set down for further hearing. At this further hearing, October 9, 1957, additional evidence was offered by Carnegie. The county did not present any evidence, but renewed its motion to dismiss. On February 9, 1959, the commission entered an order granting Carnegie's application for approval of the agreement. A petition for rehearing filed by the county on March 5, 1959, was denied by the commission on March 24, 1959. This appeal by the county followed. We granted Carnegie permission to intervene as an appellee. The factual situation is set forth in the following excerpt from the commission's order of February 9, 1959:

"The essential facts giving rise to these proceedings are not materially disputed. By conveyances executed in 1890, 1900, and 1906, applicant acquired legal title in the nature of easements to three parallel and adjacent rights of way crossing a tract of land located in Mifflin Township (now West Mifflin Borough), Allegheny County. Over these rights of way applicant constructed, and for many years maintained, three natural gas transmission lines connecting its sources of supply in West Virginia with certain plants of United

States Steel Corporation in Munhall, Allegheny County, and with domestic customers in the area of Munhall. The transmission lines occupied these rights of way at an average depth under the surface of three feet. They were of 16-, 20-, and 24-inch diameter, respectively.

"Shortly before 1929 the County of Allegheny acquired the tract (not including applicant's easements) and proceeded with plans to construct the Allegheny County Airport. These plans entailed lowering the grade of some portions of the land in which applicant's rights of way were located, and substantially raising the grade of other portions by adding fill. Of the total length of applicant's rights of way (appearing from its exhibits to approximate 3,000 feet), about 1,350 feet was proposed to be covered over with additional fill 10 to 13 feet in depth. Another 1,300 feet was to be lowered in grade and covered with concrete and bituminous materials for airplane runways. Where the grade was to be lowered, applicant's transmission lines would have to be immediately relocated at the altered grade. Where the grade was to be elevated, the transmission lines could be left in place, but would, as a practical matter, be rendered inaccessible for maintenance and repairs in the future. It appears clear that any interference by the county with applicant's rights of way in the implementation of its airport development plans would have been a compensable taking in the context of eminent domain proceedings . . .

"In lieu of proceedings in eminent domain, the county and the applicant negotiated and on August 3, 1929, executed the agreement which is before us. On behalf of applicant it was executed by its then president, and on behalf of the county by two of its then commissioners. Among other provisions, the agreement declared: 'This agreement is made and entered into subject to the approval of the Public Service Com-

mission of the Commonwealth of Pennsylvania, and application thereto for approval hereof shall be made by the Company promptly upon the execution hereof by both parties'. Except for this paragraph, the contract on its face purported to become effective immediately. The approval contemplated by the parties, however, was never sought or obtained by applicant during the tenure of our predecessor, The Public Service Commission, at any time before its statutory demise in 1937. The record contains no explanation as to applicant's failure in this respect. It was stated by applicant's attorney, during the course of the hearings, that the attorney who negotiated the agreement on its behalf has died, and that in 1950 the records of the transaction retained by his firm were routinely destroyed.

"In substance, and in part material to these proceedings, the agreement contained applicant's consent, for a consideration of one dollar, to the grade alterations affecting its rights of way which are above described. Applicant further agreed to permit the lowering of grades in the necessary areas and to install new transmission lines at or under the lowered grade therein, subject to being reimbursed for its relocation costs by the county. With respect to the areas required to be raised in grade by added fill, the agreement provided that existing lines were to remain in place, but that—'If, at any time in the future, any or all of the three present lines which the Company is permitting to remain in their present location . . . shall become unserviceable, the Company shall have the right to . . . install a new line or lines (at or under the new grade)'. It was further provided that 'upon completion of the work (the Company) shall submit a bill to the County for the amount of the cost thereof, which the County shall promptly pay'.

"Following execution of the agreement on August 13, 1929, there was accomplished the relocation at

lowered grade of those portions of applicant's facilities lying within areas to be excavated. In 1930 applicant billed the county for $35,815.57, representing the cost of its share of this work, and was promptly paid.

"In 1954, following complaints of gas leaks in the vicinity of the airplane hangers, applicant determined that certain portions of its facilities over which fill had been placed in 1929, and which had not subsequently been disturbed, were no longer serviceable. Applicant replaced these lines at a cost of $36,341.55. In August, 1955, it submitted its bill to the county, referring specifically to the agreement of August 13, 1929. In July, 1956, the county controller, after hearing, refused payment. It is stated in the application, and not denied, that the controller's declared reason for refusal was that the agreement 'is without effect in that it lacks the requisite approval of the Public Utility Commission and its predecessor, the Public Service Commission'. Thereafter, applicant instituted these proceedings seeking, in its words to have us declare our approval of the 1929 agreement 'nunc pro tunc' ".

Appellant's first contention is as follows: "A Contract or Agreement Between a Public Utility Company and a Municipal Corporation Has No Legal Effect or Validity Where It Was Neither Filed With the Public Utility Commission Prior to Its Effective Date as Required by Statute, Nor Approved by the Predecessor Public Service Commission in Accordance With the Then Existing Law". In considering this contention it should be noted that, in its order initiating the investigation, the commission employed the language of Section 911 of the Public Utility Law,[1] 66 P.S. 1351, which provides as follows: "No contract or agreement between any public utility and any municipal corpora-

---

[1] Act of May 28, 1937, P. L. 1053, 66 P.S. 1101 et seq.

tion shall be valid unless filed with the commission at least thirty days prior to its effective date: Provided, That upon notice to the municipal authorities, and the public utility concerned, the commission may, prior to the effective date of such contract or agreement, institute proceedings to determine the reasonableness, legality, or any other matter affecting the validity thereof. Upon the institution of such proceedings, such contract or agreement shall not be effective until the commission grants its approval thereof". The corresponding provision of the statute in effect at the time this contract was executed, Act of 1913, P. L. 1374, read as follows: "No contract or agreement between any public service company and any municipal corporation shall be valid unless approved by the Commission".

Appellant argues that the contract is invalid because it was neither approved by the commission under the former statute, nor filed with the commission prior to its effective date under the present statute. The commission took the position that, as statutory successor to the Public Service Commission, it had jurisdiction over the subject matter of Carnegie's application, and that there was an essential congruity between the old and new provisions of the law relative to the approval of contracts between public utilities and municipal corporations. We are clearly of the opinion that the regulatory authority which existed over such contracts under the Act of 1913 was intended to pass to the Public Utility Commission under the Act of 1937. The former statute provided that the contract should not be valid unless approved by the commission. If this proceeding was governed by the Act of 1913, we would necessarily be required to conclude that, upon commission approval, the contract became fully enforceable. The Act of 1937 effected merely a procedural change in order to expedite the approval of such contracts. Instead of requiring affirmative action by

the commission, the contract now becomes valid automatically unless the commission acts. The requirement that the contract must be filed with the commission at least thirty days prior to its effective date was not intended to mean that the utility should lose its rights under a contract which is not timely filed. We find no substantive irregularity in the consideration by the present commission of this 1929 contract.

Appellant's second contention is as follows: "Where There Is No Evidence or Explanation of the Failure to File the Agreement or Secure the Approval of the Commission, the Commission May Not Properly Grant Its Approval Twenty-Nine and One-Half Years Later, in Effect, Nunc Pro Tunc". Appellant's position is that, by inserting such a requirement in the agreement, the county insisted on prompt submission thereof to the commission, and that the present order of the commission is in effect a nunc pro tunc approval without proper basis or lawful authority. It is argued that "the record is devoid of any extenuating circumstances, valid excuse, or reason for the company's failure to file the agreement and seek Commission approval. The company says only that it never filed. In the absence of any adequate explanation, it must be presumed that the only reason was neglect". In this connection the commission took the position that "we may neither pass on this contract nunc pro tunc, nor ignore the history of the matter to date in deciding these proceedings".

We are in accord with the view of the commission that its order of February 9, 1959, does not have the effect of an approval nunc pro tunc. Nor are we persuaded by appellant's contention that there is no evidence or explanation of the failure to file the agreement promptly. Admittedly, the passage of time in the case at bar has been unusually long. However, it must be borne in mind that between 1930 and 1954 there was no occasion to invoke the terms of the con-

tract. At the time the contract was executed the county proceeded with the construction of the airport. It promptly paid the utility the charges then incurred for work necessarily done at that time. Thereafter, and until the performance of the present work, neither party had any reason to refer to the agreement. There has been no showing that this passage of time prejudiced the county in any way. While we do not condone the delay, we cannot in good conscience determine that, unaccompanied by harmful consequences to the county, it should be allowed to vitiate a contract entered into in good faith.

Appellant's third contention is as follows: "The Provisions of Section 911 of the Act of 1937, P. L. 1053 Are Mandatory and Are Based Upon the Same Public Policy as the Other Provisions of the Public Utility Law, and Are Not Merely Directory Provisions Based Upon Administrative Convenience and Private Convenience". The answer of the commission is that "the procedural changes effected by the 1937 legislature were directory and not mandatory".

The question as to whether the provisions of a statute are directory or mandatory in nature must be determined by ascertaining the legislative intent. Where, as here, construing the language as mandatory would so seriously impair the purpose of the statute as to amount to a defeat of that purpose, we must consider its provisions as directory: *Prichard v. School District of Willistown Twp.*, 394 Pa. 489, 147 A. 2d 380. And see *County Commissioner Substitute Nomination Case*, 383 Pa. 372, 118 A. 2d 750. When time and manner are not the essence of the thing required to be done, the statute will be regarded as directory and proceedings under it will be held valid, even though the command of the statute as to form and time has not been strictly obeyed: *Deibert v. Rhodes*, 291 Pa. 550, 140 A. 515. While the word "shall" is used in connection

with the validity of the contract or agreement, it is not used in connection with the procedure to be employed in establishing such validity. In the latter regard, time is not of the essence. The purpose of the statute is to provide a means of safeguarding the rights of both the public and the utility. This has been done by the commission in the instant case.

The duty imposed upon the commission by the present statute is "to determine the reasonableness, legality, or any other matter affecting the validity" of the contract. According to its order, the commission did make a determination of these matters in favor of Carnegie's application. Appellant argues that the commission improperly instituted a hearing on the contract of its own motion, and that it should have determined only whether or not there were extenuating circumstances to justify Carnegie's application for approval nunc pro tunc. Appellant further argues that the commission acted improperly in "considering the agreement and all subsequent events as though the applicant was in full compliance with the code instead of in violation thereof". We are not in sympathy with these arguments. To concede that the commission could perform a part of its duty, yet deny it the power to establish the facts necessary for a determination, is not realistic. We must assume that the legislature did not intend the section in question to be impossible of execution.

Appellant's fourth contention is as follows: "The Agreement in Question Is Against Public Policy and Is Not Legally Valid, in That It Imposes a Continuing, Uncertain and Undetermined Liability Upon the Municipality to Provide a Public Utility Company With New Transmission Lines After the Normal Useful Life of said Lines Has Been Exhausted, and the Findings of the Commission in This Respect Are Without Evidence to Support Them". By way of answer to this

contention the commission made the following appropriate statement:

"We find nothing in this agreement which was not, in our view, equitable and fair at the time of its making. The arrangements contemplated by the parties were simple and were in the public interest. From the standpoint of the county, it was assured that applicant's established property rights would not bar its development plans, and was saved the substantial expense of eminent domain proceedings which would otherwise have been necessary. . .

"From the standpoint of applicant, it was spared an uncertain recourse to a jury of view, as well as the cost and inconvenience of defending in eminent domain proceedings. Most importantly, many of the existing facilities of applicant were permitted to remain in place, though rendered inaccessible, with a view to their continued use for the balance of their useful life—a solution which avoided economic waste and was of obvious benefit both to applicant's customers and to the public at large. . . After thorough scrutiny of all the provisions of this agreement it appears to us to contain no provision which is inimical to the public interest, which is unfair or unreasonable from the standpoint of either party, or which, even if we were so empowered, we would of our own motion be inclined to change. We therefore hold this agreement to be reasonable and fair."

Appellant argues that the effect of the agreement is to guarantee Carnegie a set of new lines at county expense, whenever at any time in the future the old line became unserviceable from any cause whatsoever. It avers that it is against public policy to impose on the taxpayers of the county an obligation which is normally and properly the obligation of the utility company. Appellant concedes that a political sub-

division may agree to reimburse a utility for reasonable expenses occasioned by a necessary relocation of its lines, or an interference with its rights-of-way. It admits that such an agreement may be entirely proper if the amount payable is related to the political subdivision's legal responsibility. However, appellant asserts that "there is no evidence to show that the company was damaged at all, or that it was required to replace the lines in question any sooner than would have been the case under normal circumstances of time, weather and soil conditions". This statement is in direct conflict with the evidence taken by the commission. There is abundant testimony showing that the utility suffered serious damage by reason of the construction of the airport. Approximately 1350 feet of the lines were covered with ten to thirteen feet of fill. Another 1300 feet was relocated, lowered in grade and covered with paving for the runways. The only alternative would have been to completely relocate all of the lines at the time the airport was constructed. Certainly it cannot be seriously contended that the utility did not suffer damage. Moreover, the amounts which the county became obligated to pay, though not absolutely fixed in dollars, were nevertheless limited by the nature and extent of the physical facilities which were ultimately to be replaced. Similarly, the time of payment, though not specified by calendar date, was fixed by the physical condition of those facilities as of the date the contract was executed, and by their remaining useful life. Thus, there is no element of a long term contract to pay moneys in the future in amounts bearing no relationship to circumstances existing at the time the contract was made. We find nothing illegal in postponing the payment of a part of the damage until such time as the lines became unserviceable. It was within the power of the commissioners to enter into a contract providing for future payment. See

*Graham v. City of Philadelphia,* 334 Pa. 513, 6 A. 2d 78.

Appellant's fifth and final contention is as follows: "The Commission Failed to Find Any Legal Authority or Justification for Such an Agreement, Other Than the Fact That It was Preceded by Negotiations". In this connection appellant emphasizes the following sentence from the commission's order: "Moreover, a strong inference that the agreement was reasonable and in the interest of both parties is to be drawn from the fact that it was preceded by negotiation, and that each party had substantial bargaining power and was represented by counsel of its own selection".

Our examination of the entire order discloses that the commission did not rest its decision on this inference alone, although we are in agreement with the commission's conclusion that it was a persuasive circumstance. The commission also found that the agreement did away with the necessity of eminent domain proceedings, and that it avoided economic waste by permitting a portion of the installation to remain in place for the balance of its useful life. Furthermore, the commission found that the agreement contained no provision which was inimical to the public interest, or which was unfair or unreasonable from the standpoint of either party. It is significant that appellant offered no contradictory testimony. In short, the county is seeking to evade the provisions of the contract after securing all of its benefits. A municipality is not at liberty to avoid its contractual obligations merely because it deems it to be for the benefit of its citizens to do so: *City of Philadelphia v. Fidelity Philadelphia Trust Co.,* 358 Pa. 155, 56 A. 2d 99. And see *Cameron Bank v. Aleppo Twp.,* 338 Pa. 300, 13 A. 2d 40.

In conclusion, amid the maze of technical contentions advanced by appellant's able counsel, one fact stands out clearly. There is nothing unreasonable or

unfair about the contract under consideration. It was approved by the then county solicitor, subsequently a judge of the court of common pleas and of this court. The county received substantial benefits therefrom. We are all of the opinion that the commission, acting in its administrative capacity, properly approved Carnegie's present application, thereby rejecting appellant's attempted repudiation of its obligation. Under Section 1107 of The Public Utility Law (66 P. S. 1437), we may not set aside an order of the commission "except for error of law or lack of evidence . . . or violation of constitutional rights". The instant record does not disclose any such defects.

The order of the commission is affirmed.