## Geyer v. Ausherman

*Thomas H. Crider*, for plaintiff.

*John W. Keller*, for defendants.

DEPUY, P. J., September 26, 1963.—Harry R. Geyer filed his complaint in mandamus on August 30, 1963, seeking an order that defendants permit plaintiff to take the loyalty oath, that they accept plaintiff's filing fee, and that they cause plaintiff's name to be printed upon the official ballots to be used at the municipal election to be held November 5, 1963.

Defendants are the members of the Board of Commissioners of Franklin County who at the same time serve in the capacity of the Franklin County Board of Elections, hereinafter called the board. Harry R. Geyer received as a write-in candidate a plurality of the Democratic votes cast at the primary election held May 21, 1963, for the office of Clerk of Courts of Franklin County.

The complaint avers that the board has informed plaintiff that his name will not be printed on the ballot for the fall election for the reason that he did not take the loyalty oath within 60 days after the primary as required by statute, and that they have also refused to accept plaintiff's filing fee of $25 tendered prior to and

on August 23, 1963; that plaintiff did present himself at the office of the board on or shortly before June 22, 1963, and requested such papers or documents as he was required as a write-in candidate to execute, that he then and there executed all papers handed to him at the office of the board, and that the printing of official ballots for the municipal election of November 5, 1963, has not yet been commenced.

Defendants filed an answer admitting some of the allegations of the complaint and demanding proof of others.

A hearing was held on the complaint and answer on September 16, 1963. Testimony of a number of witnesses was received and transcribed. Argument of counsel was heard by the court on September 20, 1963.

What plaintiff seeks is an order that the Board of Elections permit him to take the loyalty oath and to pay the filing fee nunc pro tunc.

From the evidence taken at the hearing, we make the following

*Findings of Fact.*

1. At the primary election in Franklin County held May 21, 1963, Harry R. Geyer received a plurality of the Democratic write-in votes cast for the office of Clerk of Courts of Franklin County.

2. About June 20, 1963, a Monday, Harry R. Geyer came to the office of the County Board of Elections at the courthouse and, dealing with a clerk of the board, whose name was then and is now unknown to Geyer, inquired for papers that were to be signed by him as a write-in nominee. Upon being handed a single paper, he filled it out, took it across the hall, made affidavit to its averments and left the paper at the office of the board. In fact, the paper was the candidate's affidavit of expenditures at the primary election.

3. Geyer did not specifically inquire of the board clerk as to signing the loyalty oath and gave no thought

to the specific matter at the time. The matter of the loyalty oath was not called to his attention by the personnel he dealt with at the Board of Elections. Geyer was under the impression that he had been offered and had signed and sworn to all the papers necessary to be sworn to in placing his candidacy in legal posture.

4. Plaintiff lives in the village of Fannettsburg in this county. During the summer his regular place of residence is at a cottage near the sawmill he operates, some seven miles from Fannettsburg; his wife resides at his Fannettsburg dwelling during the week and on weekends comes over to the cottage, bringing what she considers his important mail as received during the week.

5. Though the board is not legally required to do so, the board's practice has been to forward a letter to candidates concerning the requirement of signing a loyalty oath. A form letter to that effect, dated June 19, 1963, was mailed by the board to Harry R. Geyer at Fannettsburg, which letter evidently remained in a pile of mail at his residence in Fannettsburg, and, being considered unimportant mail, was not brought over by plaintiff's wife to the cottage at the sawmill.

6. On August 3, 1963, the Democratic committeeman for plaintiff's district informed him that he had not taken the loyalty oath. Plaintiff went home and, after a search, located the letter from the Board of Elections which he had not previously seen.

7. The June 19, 1963, letter sent by the Board of Elections erroneously contained in its language a statement that the loyalty oath would have to be filed by June 22, 1963, whereas the correct date was July 22, 1963.

8. On a number of earlier occasions when plaintiff was elected to the Board of School Directors of Metal Township, he had executed a loyalty oath so that the document was not a novel one so far as he was con-

cerned. Geyer had also taken a loyalty oath when he undertook work for the Pennsylvania Turnpike Commission and also when trucking in road work for Metal Township.

9. Had the staff at the office of the Board of Elections presented to plaintiff a loyalty oath blank and/or reminded him of the matter, he would have executed the same at his visit to the office on June 20, 1963. In short, his omission to do so was due to oversight both by the office staff and by plaintiff himself as a candidate.

10. The deadline under the Pa. Election Code for filing of the affidavit of expenditures by a candidate was June 22, 1963, and the deadline under the Pa. Loyalty Act for filing the loyalty oath was July 22, 1963.

11. None of the personnel working in the office of the Board of Elections on June 20, 1963, recalls dealing with plaintiff when he was in the office on that occasion when he received and executed the candidate's expense affidavit.

12. Under the customary routine used by the Board of Elections the printing of ballots begins shortly after October 1st and must be completed previous to October 7, 1963, because of necessity for mailing out absentee ballots on the latter date.

13. On August 23, 1963, plaintiff Geyer met with the Board of Elections for the purpose of belatedly paying his filing fee and taking the loyalty oath. The board rejected his offer and adopted a resolution that his name should not, because of tardy filing, appear on the ballot at the municipal election to be held November 5, 1963.

*Discussion*

To the ordinary citizen acquainted with the English language it may come as a surprise that, where a statute adopted by the legislature expressly provides

that specified action is to be taken on or before a certain date, using the words "shall" or "must", a question may arise whether the effect of the statute is mandatory. Yet the law reports quickly show that, at times, such provisions have been found by the courts to lead to results so unreasonable and unfair that much judicial ingenuity has been employed in assigning a different meaning to certain of the statutes.

The Statutory Construction Act of May 28, 1937, P. L. 1019, 46 PS §501, et seq., declares that one of the rules to be followed in determining the intent of the legislature is . . . "that the Legislature does not intend a result that is absurd, impossible of execution, or unreasonable": 46 PS §552(1).

We are face to face with a problem where, if one gazes merely at formalities, an unreasonable result is the consequence, a result which defeats without necessity the democratic process. The court should go deeper into the underlying foundations of our form of government. Our system of popular rule presupposes that the people are entitled to elect those who govern them. An election envisages a choice, different from the procedure in the dictator countries where a single slate of candidates is presented. True there are times in our government when an office is to be filled in which there is not enough interest to arouse a choice of candidates. But that ought to be the exception rather than the rule. A court should not be astute to consecrate such a unilateral situation when there is any reasonable means of avoiding it.

On the other side of the coin, it is necessary that our government proceed according to rules whether in elections or in other matters. Our government must have a system or we will have anarchy. Hence, when seeking the true meaning of a statute which appears to be mandatory in its language, a court must decide in each instance whether the basic problem is one of

form or of substance. In case of a nomination petition to place a certain candidate on the ballot, it has been correctly held that if the petition is not properly executed or lacks the requisite number of signers, there is actually no effective nomination and, barring exceptional circumstances of deception or fraud, a belated effort to breathe life into that which is nonexistent is not likely to meet with relief by the courts.

But there are cases where an effective nomination has been made but, because of excusable error, some detail has not been attended to with exact correctness, and the courts have permitted such nomination papers to be perfected nunc pro tunc. In cases where an omission or misrepresentation on the part of election officials or employes has occurred, the courts have permitted an amendment nunc pro tunc to correct the defect or have allowed the filing of necessary affidavits to prevent hardship or injustice: Carter Appeal, 398 Pa. 548; Lewis' Petition, 57 D. & C. 53. If one searches through the law reports, he can find numerous situations, not merely under the Pennsylvania Election Code, where the courts have interpreted language which is mandatory in terminology to be instead considered what the courts have termed merely "directory". In such cases, tardy action, if for excusable reasons, has been given legal effect by the courts.

A well known instance of this kind developed under the provisions of the Public School Code of March 10, 1949, P. L. 30, as amended, 24 PS §1-101. It was required that a school board levy taxes in April or May of each year. By reason of the frailties of human nature, some school boards have not, because of disagreement or otherwise, gotten around to timely levying of the necessary taxes. A taxpayer's suit to set aside such a belated levy could well result in closing the schools for a year. In those cases, the courts had little difficulty in deciding that the language of the statute is

"directory" rather than "mandatory" even though its terminology appears to be mandatory: Walker v. Edmonds, 197 Pa. 645; York & Foster, Inc., Tax Assessment Case, 163 Pa. Superior Ct. 602, 605. The courts have looked at the substance rather than the form of the problem, have decided the essential thing is to keep the schools open. They have approved the late levy of taxes rather than assuming the legislature intended an absurd result.

In McQuiston's Adoption, 238 Pa. 304, 309, the Supreme Court said:

"It is a settled rule that in the construction of statutes an interpretation is never to be adopted that would defeat the purpose of the enactment, if any other reasonable construction can be found which its language will fairly bear. If, therefore, it appears that by construing the language of the act in the particular referred to as mandatory, the purpose of the act would be so seriously impaired as to amount to a defeat in purpose; while, on the other hand, if construing it as simply directory its efficiency is preserved, the latter construction is to prevail."

In Cowan's Estate, 184 Pa. 339, the Supreme Court, ruling on a statutory time limit for filing claims against an estate, said, quoting Dwarris on Statutes, 222:

". . . There is an established principle that where as here the thing to be done may as well be done after as before the time prescribed, where it is a matter of manner, order or convenience, rather than of substance, the courts assume the legislative intent to have been merely directory."

In Koch Election Contest Case, 351 Pa. 544, the Supreme Court said that ". . . statutory limitations are not conclusive when good cause is shown," and that the very purpose of election laws is to secure freedom of choice and to prevent fraud and corruption; to

obtain a fair election and an honest election return; to insure fair elections, or an equal chance of opportunity for everyone to express his choice at the polls; and to secure the rights of duly qualified electors and not to defeat them. The election laws should not be so interpreted as to defeat the very object of their enactment. Election laws are sui generis. Laws regulating the rights of an elector are merely directory.

In Coolbaugh v. Herman, 221 Pa. 496, 502, the Supreme Court said:

". . . when a statute directs certain proceedings to be done in a certain way, or at a certain time, the law will be regarded as directory and the proceedings under it will be held valid, though the command of the statute as to form and time has not been strictly obeyed; the time and manner not being the essence of the thing required to be done."

The Pennsylvania Loyalty Act of December 22, 1951, P. L. 1726, sec. 14, 65 PS §224, as amended June 19, 1961, P. L. 446, sec. 1, provides inter alia:

"No person shall become a candidate for election under the . . . act, . . . known as the 'Pennsylvania Election Code,' . . . to any State, district, county, or local public office whatsoever in this Commonwealth, unless he shall file with his nomination petition, nomination paper or nomination certificate a statement, under oath or affirmation, that he is not a subversive person, as defined in this act, which statement shall contain notice that it is subject to the penalties of perjury. No nomination petition, nomination paper or nomination certificate shall be received for filing by any county board of elections or by the Secretary of the Commonwealth unless accompanied by the statement required hereby, nor shall the name of any person who has failed or refused to make the statement be printed on any ballot or ballot label to be used at any general, municipal, primary or special election.

"The statement required by this section shall be filed by any person nominated at a primary election as a write-in candidate within sixty (60) days after the primary election in which he is nominated, and shall be filed by any person not previously nominated, who is elected as a write-in candidate at a general, municipal or special election, prior to being sworn into the office to which he is elected."

The loyalty oath requirement is a separate law, not a part of the Pennsylvania Election Code of June 3, 1937, P. L. 1333, as amended May 6, 1943, P. L. 196. It is our view that the time limit in the Pennsylvania Loyalty Act does not fall in the same category as time limits for filing nomination papers, which have been held mandatory in cases arising under the Pennsylvania Election Code.

The Supreme Court has, in interpreting mandatory language, said that attention must be given to what is the essence of the thing aimed at by the legislature in the particular legislation. In the present problem, we are not concerned with failure on the part of Mr. Geyer to be correctly nominated, a matter about which there is no question. The only question is whether his name should appear on the ballot as a person loyal to the United States, under the terms of the Pennsylvania Loyalty Act. Certainly, one is not more or less loyal depending upon what day he takes the loyalty oath. The particular day of taking the oath, aside from the necessity for observing some kind of system in the manner, is not important. Printing of the ballots has not yet commenced and will not ordinarily commence for more than a week. The voters can be as well assured concerning the loyalty of the candidate by an affidavit filed in early August or presently as if the oath had been filed by July 22d.

In seeking a correct solution of the present problem, it is well to look at part of the Pennsylvania Election

Code dealing with the filling of vacancies. The Pennsylvania Election Code, at section 987.1, for example, provides that a vacancy shall exist if the filing fee is not filed in time. In case of death or withdrawal of a candidate, for example, after a primary election, the code provides a method by which the political party machinery may act to fill the vacancy. The present problem could have been dealt with in that framework had the legislature provided for it. However, there is no statutory provision for filling a vacancy in the case of nonfiling of a timely loyalty oath. There appears no reason for the voters to be deprived of a choice of named candidates for an important county office like the clerk of courts.

This principle animated the court of Allegheny County and the Pennsylvania Supreme Court in 1955, and was adopted by the Franklin County Board of Elections, when a candidate at the fall election for county commissioner died after the date when, under the Pennsylvania Election Code, a vacancy would be regularly filled by the party machinery. The courts held the voters, when going to the polls, are entitled to a choice of candidates and that it was lawful, without express authority in the Pennsylvania Election Code, for the appropriate party to make a new nomination and have the name placed on the ballots, already printed, by means of stickers: County Commissioner Substitute Nomination Case, 383 Pa. 372.

It can be viewed as a paradox of the Pennsylvania Election Code that plaintiff here could still become a write-in candidate for the municipal election and, if elected, could take the loyalty oath after the election. This being so, is it not better that, in light of his nomination at the primary, he take the loyalty oath now, belatedly, so that in a regular way a choice will be presented on the ballot to the voters? The legislature we think intended primarily to afford protection from

subversive persons as candidates and was not interested primarily in an arbitrary time limit for taking the oath.

The courts have shown a policy to construe the Pennsylvania Election Code so as not to deprive the voters of a choice of candidates where there has been, in fact, a duly nominated candidate: Lewis' Petition, 57 D. & C. 53; County Commissioner Substitute Nomination Case, 383 Pa. 372; Koch Election Contest Case, 351 Pa. 544.

The time of taking the loyalty oath in the present case is not of the essence of securing an effective nomination for the office involved. There was an effective nomination. The only problem before us here deals with the time when the loyalty oath must be filed in order to have a name printed on the ballot. So long as the loyalty oath is filed prior to the printing of the ballot, the intended purpose of the Loyalty Act has been assured.

A circumstance could occur where a candidate has been reprehensibly negligent in his handling of the matter of taking the oath and where a court would decline to aid him. Such conduct cannot be attributed, we think, to plaintiff here. He did come to the county commissioners' office, as shown by the evidence, for the purpose of executing whatever papers were needed to perfect his candidacy. Apparently, because of oversight, he was offered and executed merely the expense account affidavit and not the loyalty oath. The board of elections was not required to mail him notice about the loyalty oath, but they did so, even though its language was incorrect. Working as he did at some distance from his home, he did not receive the mail. We believe a fair view of his conduct should not foreclose him from the opportunity of being a candidate.

We hold the language of the Loyalty Act requiring the filing within 60 days after the primary election of

a statement under oath that candidate "is not a subversive person" to be directory rather than mandatory. Obviously the board of elections, when the candidate had not filed the loyalty oath within 60 days, adopted the only course open to it under the language of the statute and rejected the late filing of the oath and filing fee. The problem was one calling for judicial interpretation.

Now, September 26, 1963, judgment in the cause is given in favor of plaintiff and against defendants. It is ordered that if plaintiff shall submit himself at the office of the board of elections within three days after the date of this order and shall execute the loyalty statement in due form of law and shall submit to the said board his filing fee, the same shall be accepted by defendants, and the name of plaintiff as Democratic candidate for office of clerk of courts shall be placed upon the official ballot to be used at the municipal election in Franklin County on November 5, 1963. Exception granted to defendants.