Philadelphia, Appellant, *v.* Fidelity-Philadelphia Trust Company, Trustee.

Argued December 4, 1947. Before MAXEY, C. J., LINN, STERN, PATTERSON and JONES, JJ.

*Howard E. Stern,* Assistant City Solicitor, and *Robert T. McCracken,* with them *Herman N. Schwartz,* Assistant City Solicitor, *Frank F. Truscott,* City Solicitor, and *Montgomery, McCracken, Walker & Rhoads,* for appellant.

*Thomas Stokes,* with him *John Sailer* and *Pepper, Bodine & Stokes,* for appellee.

OPINION BY MR. CHIEF JUSTICE MAXEY, December 30, 1947:

The City of Philadelphia, appellant, filed a Bill in Equity requesting that a mandatory injunction be issued against the Fidelity-Philaddelphia Trust Company, Trustee, to receive from it $50,000 to be applied to the redemption and cancellation of outstanding trust certificates of the "Philadelphia Gas Revenue Trust". The

Fidelity-Philadelphia Trust Company is Trustee for certain certificate holders in the "Philadelphia Gas Revenue Trust" created in 1939 and secured by the assignment of certain future rentals to become due to the City from the operation of the Philadelphia Gas Works. It challenges the right of the City to pay with funds other than gas rentals.

The Trust had its origin in the following series of transactions. On May 1, 1939, the City of Philadelphia in order to raise the funds necessary to balance its budget sold and assigned, for an initial period of 18 years, the future gas rentals due it from the Philadelphia Gas Works Company under its operating agreements to a nominal assignee, C. Smith, in consideration of $41,000,-000. The sum so obtained was to be repaid with interest at 3½% and the incidental expenses of the project, solely from the proceeds from the operation of the Gas Works. On the same date, Smith, acting on behalf of the contributors to the purchase price, and for the purpose of securing repayment, sold and assigned his entire interest in the Assignment to the Fidelity-Philadelphia Trust Company, as Trustee, under a Trust Agreement entered into between Smith and the Trust Company and consented to by the City. Trust certificates which bore interest at the rate of 3½% per annum and were made payable "only from and out of such payments as may be received by the Trustee for such purposes" under the Trust Agreement and Assignment, were issued to subscribers. The agreement to assign between the City and C. Smith, Trustee's assignor, was pursuant to a City Ordinance and contained the following provision: "The right of the Assignee to receive any and all amounts provided under this Assignment and Agreement shall be restricted solely to the proceeds from the operation of the Gas Works and the proceeds of insurance thereon or condemnation thereof and the proceeds of the special tax provided for by paragraph 5 hereof; and the Assignee

shall have no right to recover any part of said amounts from the general funds or property of the City or from its general tax levy or by attachment or sale of any property of the City, including the Gas Works."

On July 31, 1947, the City Council passed an ordinance authorizing the Mayor on behalf of the City to enter into two agreements with the Philadelphia National Bank, as agent for sundry banking institutions, assigning and selling the gas rentals in question in exchange for a sum sufficient to redeem and cancel all outstanding trust certificates, at an interest rate of 1.83 percent as compared to the present rate of $3\frac{1}{2}$ percent. Appellee objected to such "assignment and sale" of the gas rentals, contending that "neither the assignment nor the trust agreement contains any provision, express or implied, bestowing upon the City the right to compel redemption and cancellation of the outstanding trust certificates with monies from any source other than the gas rentals and revenues payable to the Trustee under the assignment." The court en banc dismissed the City's bill upon the ground that the "Fidelity-Philadelphia Trust Company, Trustee, is not required to receive moneys from the City or any source other than the gas rentals (including proceeds of insurance, eminent domain or the special tax),[1] to redeem the trust certificates and pay the other charges and expenses of the trust." The City appealed.

The right to accelerate the termination of the agreements with funds from other sources than the gas revenues is not expressly provided for therein and cannot be implied from any provision thereof. The City's contention "that from the four corners of the instruments considered as a whole, it clearly appears that it has a contractual right to pay to the trustee additional sums to redeem the gas rents assigned by the City" from other sources, is without factual support.

---

[1] The special tax referred to provided for the contingency that legislation or regulations might impair gas rental receipts.

As the court below said: Taking "the agreements upon their face . . . nowhere do we find the sure phrase or measured sentence authorizing the City to pay any balance with moneys from a source other than the gas rentals". The City contends that this right is implied and contemplated by the agreements. We find in the agreements no such implication. We agree with the court below that ". . . there is no provision that bestows upon the City the right or privilege to anticipate and repay with money from other sources any or all of the sums required to be paid to satisfy the outstanding certificate holders for the sums they have invested in the 'Philadelphia Gas Revenue Trust.' " This is the effect of our decision in *Graham v. Philadelphia et al.,* 334 Pa. 513 (1939), 6 A. 2d 78, a taxpayer's suit to test the constitutionality of the City's proposal to sell these very gas rentals and which was the basis for the execution of the agreements now in issue. We there made it clear that the assignment of the gas rentals did not create a debt of the City, and that "The transaction before us does not in any conceivable aspect constitute borrowing; here there is an assignment of gas rentals,—*an outright sale* of an obligation due the City under the lease, without any liability to the City thereon except a remote contingent future obligation to arise only upon legislative interference, . . ." and "In the event of a default in payment of any of the rentals, *no property of the City,* real or personal, can be taken for principal and interest. . . . Under paragraph 3(e), *the assignee has no right to recover* any part of such defaulted sums from the general funds or property of the City . . . Nor is the City required to pay out of any special tax, any deficit arising in this manner." (Italics supplied.)

When we consider that this was "an outright sale" of the gas rentals, that these rentals are the sole property of the Trustee, that they are payable to the Trustee, and that "the City assumed no obligation or liability therefor", we find no basis for the argument that the

City has the right to redeem the trust certificates with money from other sources. Such a provision, express or implied, would give the transaction the character of a temporary loan rather than an "outright sale" of a city asset. It was the non-existence of the right in the City to anticipate the rentals by a repayment with money from other sources that enabled the City to avoid having invoked against the transaction the constitutional limitation upon the increase of the City's indebtedness beyond the prescribed limits. The courts cannot permit a city to treat one of its contractual obligations as a non-debt for the purpose of putting the obligation outside the ambit of constitutional debt limitations and then later when by a change of financial condition the debt limitations are no longer applicable, to treat the obligation as a debt because it would be economically desirable for the City to do so.

By the express provisions of the agreements, "The right of the assignee to receive any and all amounts provided under" them "shall be restricted solely to the rental proceeds from the operation of the Gas Works and the proceeds of insurance thereon or condemnation thereof and the proceeds of the special tax provided for" by them. The assignee's rights to recover are further restricted so that he has "no right to recover any part of said amounts from the general funds or property of the City or from its general tax levy or by attachment or sale of any property of the City, including the Gas Works."

This provision is not unilateral. To adjudge it unilateral would be inconsistent with the entire tenor and purport of the assignment. The court below properly held that the contract not only constitutes a limitation upon the certificate holders as to the source of payment but it also means that the City is not privileged to use other sources of payment. The Certificate holders must look for payments of their certificates to funds received by the Trustee under the Trust Agreement and the As-

signment. The trust certificates themselves provide: *"Principal* of, premium, if any, and interest on this Trust Certificate are *payable . . . only from* and out of *such payments as may be received by the Trustee for such purposes under the Trust Agreement and under a certain Assignment* and Agreement (hereinafter called the 'Assignment'), dated as of May 1, 1939, between the City of Philadelphia and the Assignor, which Assignment has been assigned to the Trustee to provide for the payment of the principal amount of the Trust Certificates, the premiums thereon, if any, and interest thereon, and for the other uses and purposes set forth in the Trust Agreement." (Italics supplied.)

The same provision as to the limited source of payment is found in Article I, Section 1, which specifies that the certificates shall be payable as to principal, premium, if any, and interest only out of payments received by the Trustee for such purposes under the Trust Agreement and under the Assignment.

The statement that the certificates are redeemable by the Trustee through the operation of the Sinking Fund "or otherwise" must be read in connection with the language in the same sentence limiting the source of payment. When this is done it is apparent that the phrase "or otherwise" refers to redemption through the Reserve Fund. As to this the court below well said: "And the words 'or otherwise' used in a number of places clearly mean 'otherwise under the agreements,' for there are various situations contemplated by the agreements themselves where these words may become operative; the words cannot however be broadened to mean that the City may offer other moneys to the Trustee when such a provision could, and undoubtedly would have been stated directly if that were what the contracting parties wanted."

The City contends that Article VIII, Section 2, which provides: "SECTION 2. The Trustee covenants and agrees to hold, allocate, apply and distribute the monies

received by it under this Trust Agreement and under the Assignment and from the Assignor when and as such monies shall be received, for the purposes and in the order named as provided in Article III hereof," indicates that the assignor might elect to pay moneys other than provided for by the Trust Agreement or the Assignment. We do not so interpret the Trust Agreement. The section referred to directs that the moneys received under the Assignment and from the assignor shall be applied by the Trustee as provided in Article III. A reading of this Article discloses that the money paid by the assignor (C. Smith) to the Trustee is specified as being the balance, if any, of the funds referred to in the next to last preamble of the Trust Agreement, namely, the balance of the subscriptions to the fund used by C. Smith to pay the sum of $41,000,000 to the City. There was in fact such a balance received by the Trustee at the inception of the Trust amounting to $358,750. Article III contemplated no other payment from the assignor, who was C. Smith and not the City (as the introductory paragraph of the Trust Agreement discloses).

In addition to the restrictions inherent in the agreement, by the express terms of the assignment the right of the City to accelerate redemption with funds obtained from a resale of the gas rentals is negatived. The assignment contains covenants on the part of the city which are inconsistent with its alleged right to resell the gas revenues as it proposes to do. These covenants are:

"1. The City will *neither do* nor omit to do *anything* (except with the written consent of the Assignee) . . . *which might impair* or injure *the rights* or benefits *transferred* and assigned to the Assignee under this Assignment and Agreement, . . ."

"2. The City *will not sell, transfer,* lease, mortgage, or *otherwise dispose of* or encumber . . . all or any portion of the Gas Works or any interest therein, used or useful in the operation thereof, or *any rights of the*

*City under the Amended Agreement,* except as herein provided." (Italics supplied.)

The principal right of the City under the Amended Agreement is the right to receive the gas rentals. It is this right that the City so clearly covenanted "not to sell, transfer or otherwise dispose of". The City's proposed resale of the gas rentals will be a violation of this covenant, and if permitted could only result in impairment and injury to the rights assigned in the agreements. This we will not permit the City to do.

The question now being adjudicated is solely one of mutual contractual rights and reciprocal obligations. When investors purchased these trust certificates they were justified in believing that the only money to be paid them in redemption of the certificates would be moneys received from gas rentals and that the certificates would not be redeemed faster than moneys from that source would be available for that purpose. That was the bargain. "It was so nominated in the bond" and there is no ambiguity about it. The likelihood that a long period of time would lapse before these financially attractive and well buttressed securities would be redeemed was doubtless one of the chief factors in inducing individuals to purchase them at the price they paid for them, and the time redemption factor was based on the *exclusiveness* of the source of the redemptive funds. This was an integral part of the contract and the City cannot be permitted to violate any part of its contract on a plea of public interest.

A city acting as a private corporation is subject to the same duties and liabilities as any other private corporation and it cannot violate the obligations of a contract entered into by it in its capacity as a private corporation because it deems it to be for the benefit of its citizens to do so. This Court so stated in *Western Saving Fund Society v. The City of Philadelphia,* 31 Pa. 175. In that case Chief Justice LEWIS said: " 'The objection to a law, on the ground of its impairing the obligation of

a contract, can never depend upon the *extent* of the change which the law effects in it. *Any* deviation from its terms, by postponing, or accelerating the period of performance which it prescribes, imposing conditions not expressed in the contract, or dispensing with the performance of those which are, however minute, or apparently immaterial, in their effect upon the contract of the parties, impairs its obligation:' Green v. Biddle, 8 Wheat. 84. A contract of mortgage vests an interest, and its main incident is a right to have the land applied in discharge of the debt, either in the way prescribed by the law when the contract was made, or in some form of remedy *substantially equal:* Gantly's Lessee v. Ewing, 3 How. 707. These principles have been applied to govern the contracts and control the acts of states clothed with all the powers and prerogatives of sovereignty. We see no reason why a municipal corporation, which may be created and destroyed by the state at pleasure, should stand upon higher or better footing than its own creator. Like a state, it has its public duties and its private rights. . . . The Master of the Rolls, in speaking of the *East India Company,* admitted that it had *rights* as a *sovereign power;* but declared that it had also *duties* as an *individual;* and notwithstanding its claim to the right of violating its contracts, as an incident to its character as a sovereign power, it was held to be bound by its contracts as a private company: Moodalay v. Morton, 1 Brown's Ch. Rep. 471."

Our decision in this case is in accord with the decisions of the highest courts of other states when adjudicating a question similar to the one now before us. In the case of *School Dist. No. 78, Linn County (Kansas) v. Miley et al.,* 220 Pac. 281, the facts were that in 1921 the board of state school fund commissioners purchased from School District No. 78 of Linn county, at par, bonds of that district bearing 6 percent interest, dated July 1 of that year; $1,000 maturing each year until 1935 and 1936, when $7,500 and $8,000, respectively,

became due. When the district found that it was able to borrow money at a lower rate of interest, it demanded of the school fund commission that it either accept payment of these bonds out of money to be obtained by the district through the sale of new bonds for which it had a purchaser at 4¾ percent, or that it accept new bonds bearing that interest in exchange for those it held. The commission refused the demand and a mandamus was brought to compel compliance with it. The Supreme Court of Kansas in sustaining the motion to quash the writ said, inter alia: ". . . we see no reason why, in other respects, the contract between the district and the commission is not as binding between the parties as any other. In the absence of an agreement to that effect or of a statute giving the privilege, the maker of a note as a matter of course cannot escape liability for interest for the full period contracted for, by offering to pay the principal before maturity. . . . The time the bonds were to run was one of the elements which the commission necessarily considered in deciding whether to buy the bonds. The school district having chosen to issue and sell the bonds under the existing statutes, which became a part of the contract, is bound by the obligation it assumed. . . . We hold that the commission is not required either to reduce the interest contracted for or in effect to sell the bonds to a purchaser who is willing to do so. This view merely means that the contract is to be enforced as made. Any apparent hardship to the district which it involves is a consequence of the rate of interest having been fixed higher than the market required, or of the market having changed."

In *Davis v. County of Yuba*, 13 Pac. 874 (Cal.), the County of Yuba issued bonds to the extent of $60,000 for bridge and road building purposes. The Act under which the bonds were issued provided, inter alia, that the bonds should be issued in denominations of $1,000 each and be payable in twenty years from the first day of January 1873, and shall bear interest at the rate of

8 percent per annum, payable semi-annually on the first day of July and January of each year. It also provided that the board of supervisors shall each year, previous to the making out of the duplicate or general assessment list for said county in each year, levy a tax, to be styled the "Yuba County Wagon-Road and Bridge Interest and Sinking Fund Tax," and sufficient to raise the amount of interest required to be paid; and in ten years after the issuing of said bonds they shall levy a tax for each and every year, to liquidate and pay said bonds, in ten years, that shall then remain unpaid. "The said taxes shall be levied and collected in the same manner as the general taxes for county purposes, and, when collected, shall be paid to the county treasurer, to be kept in a separate fund, to be known as the 'Yuba County Wagon-Road and Bridge Interest and Sinking Fund,' to be by him applied to the payment of the interest, as herein provided, and for the redemption and payment of said bonds under the direction of the board of supervisors."

The Supreme Court of California said: "To the extent of the means on hand thus raised, and in such fund, there can be no serious doubt but the county had a right to extinguish its bonds. It was so nominated in the law, and, had the resources of that fund thus accumulated been sufficient to pay the bonds in full at the payment of the July interest, they could have been extinguished. . . . The question still remains, had the board of supervisors a right to resort to other and independent means, such as issuing new bonds under sections 4048 to 4052, inclusive, of the Political Code, and, by placing the means thus raised in the sinking fund, to pay off the bonds of plaintiff against his consent. . . ."

The court in denying this right said: "The board of supervisors was authorized by section 6 of the act, 'whenever, at any time, after the payment of the July interest of said bonds, there shall be in the funds *so raised for the payment of the principal and interest*

of said bonds a sum of money amounting to $5,000, over and above the amount required for the payment of the annual interest,' etc., to pay such sum on the principal of the bonds in the manner by the act provided. A sum of money thus raised, and in the fund, was the condition upon which any of the bonds could be paid before the expiration of 20 years. If the bonds were due, it could make no difference to the holder from what fund he was paid; but the very question here is, were they due? The 10 years had not expired, and there could not have been in the treasury any sum of money raised for the payment of principal, because no tax could be levied therefor until the end of 10 years. What the board of supervisors did in fact do, was to raise funds by the issue and sale of other bonds, for the payment of those we are considering."

There being no doubt that under its contract with the City the Trust Certificate holders have the right to be paid only out of the gas rentals and that the City cannot treat its obligations to these holders as a debt payable at will out of the funds of the City, the latter must live up to the letter of its contract. The highest courts of the land have often declared that even a sovereign nation or a sovereign state must under the American constitutional system discharge its contractual obligations with fidelity (assuming, of course, that the contract it entered into was one which does not interfere with the discharge of the state's duty to preserve the health and morals of the community). What is true of the sovereign is, of course, true of the municipalities, which are the sovereign's creatures. In the *Sinking-Fund Cases*, 99 U. S. 700, 719, Chief Justice WAITE speaking for the United States Supreme Court said: "The United States are as much bound by their contracts as are individuals. If they repudiate their obligations, it is as much repudiation, with all the wrong and reproach that term implies, as it would be if the repudiator had been a State or a municipality or a citi-

zen. No change can be made in the title created by the grant of the lands, or in the contract for the subsidy bonds, without the consent of the corporation. All this is indisputable."

The following monitory statement of Alexander Hamilton about a government's observance of its contractual duties is equally applicable whether the government be national, state, or municipal: "When a government enters into a contract with an individual, it deposes, as to the matter of the contract, its constitutional authority, and exchanges the character of legislator for that of a moral agent, with the same rights and obligations as an individual. Its promises may be justly considered as excepted out of its power to legislate, unless in aid of them. It is in theory impossible to reconcile the idea of a promise which obliges, with a power to make a law which can vary the effect of it." 3 Hamilton's Works, 518, 519.

The decree is affirmed at appellant's cost.