618 A.2d 1080

**CUMRU TOWNSHIP AUTHORITY, now Municipal Authority of Cumru, and Township of Cumru, Appellants,**

v.

**SNEKUL, INC., Appellee.**

Commonwealth Court of Pennsylvania.

Argued Sept. 18, 1992.

Decided Dec. 2, 1992.

Reargument Denied Feb. 5, 1993.

Scott L. Huyett, for appellants.

Jeffrey L. Schmehl, for appellee.

Before CRAIG, President Judge, FRIEDMAN, J., and LORD, Senior Judge.

CRAIG, President Judge.

Cumru Township Authority and Township of Cumru (the appellants, or "the authority" and "the township", respectively) appeal from an order of Judge Thomas Eshelman of the Berks County Court of Common Pleas dated April 8, 1991, which prohibited the appellants from imposing a sewer line connection charge because it would contravene a fully integrated contract between the appellants and the appellee, Snekul, Incorporated. We affirm the decision and order of the trial court.

The facts of the case as found by the trial court are as follows. Snekul is the developer of a tract of land containing approximately one hundred and three acres in Cumru Township. Snekul is developing this land as a residential subdivision known as "Overbrook," to contain roughly two hundred single-family detached dwelling units.

Before beginning the Overbrook project, Snekul entered into an agreement with the appellants on August 5, 1980. The agreement describes the parties' duties and obligations for the construction and financing of public sewer facilities which

include a "trunk line" connecting the Overbrook project to the township's existing sewer lines.

The agreement divides the construction into two tasks. The "collection system" refers to the construction of sewage collection facilities located within the Snekul tract. The "project" is the job of connecting and extending the sewer facilities between the collection system and the township lines.

Snekul agreed to construct the collection system subject to the approval and inspection of the authority, and to pay all costs including construction, engineering, and inspection. The agreement contains three pertinent clauses that set forth the rate and fees structure:

19. The parties hereto agree that the estimated initial sewer rental rates and charges to be imposed by the Authority and/or the Township against owners of Improved Properties located in the Snekul Tract and connected to the Sewer System shall be in the amounts set forth in Exhibit "E".... Such rates are those now in effect for Sewer Service Area No. 2 of the Township and are subject to change in the ordinary course of business of the Township. All moneys received by the Authority and/or the Township from sewer rental rates and charges imposed against owners of Improved Properties located in the Snekul Tract or any extension thereof shall be applied by the Authority and/or the Township toward the operating expenses and debt liquidation requirements of Sewer Area No. 2.

. . . .

21. Authority and the Township agree to charge a tapping fee against each Improved Property, constructed in the Snekul Tract and downstream from the boundaries of the Snekul Tract ... and connected to the Trunk Line, in the amount of One Thousand Dollars ($1,000.00) per residential equivalent unit. Snekul agrees to pay to the Authority the Tapping Fee established herein for each Improved Property located in the Snekul Tract and connected to the Trunk Line through the Collection System. Authority agrees to collect from each owner and/or developer of an Improved Property, located in the area ... and connected either

directly or indirectly to the Trunk Line, the Tapping Fee established herein, except as provided in Paragraph 22 hereof. Upon receipt of the Tapping Fee established herein, it shall be distributed as follows:

(a) Four Hundred Dollars ($400.00) to Authority in payment of the tapping fee established by resolution of the Authority adopted on May 23, 1979, for Sewer Service Areas 1 and 2, of which the Project is a part.

(b) Six Hundred Dollars ($600.00) to Snekul in payment of funds advanced to the Authority under this Agreement, until such amount is repaid in full or until this Agreement is terminated as provided herein. After such advances are repaid or upon the termination of this agreement as provided herein, all moneys collected by Authority pursuant to the Tapping Fee established herein, shall remain the property of the Authority. Provided, however, no reimbursement shall be made by the Authority or the Township to Snekul for moneys advanced, as provided herein, after the expiration of fifteen (15) years from the date of completion of this Project.

The payments required from Snekul and to Authority and Snekul under subparagraphs (a) and (b) hereof, shall be satisfied by the payment of the sum of Four Hundred Dollars ($400.00) from Snekul to Authority and the credit of the sum of Six Hundred Dollars ($600.00) against the funds owed to Snekul by Authority.

22. Authority shall request the Governor Mifflin Joint School Authority and the Governor Mifflin Apartments to connect to the Trunk Line. If such connections are made the Improved Properties connected pursuant to this paragraph, shall not be required to pay the Tapping Fee established in paragraph 21 hereof, however, if the Authority shall collect any connection fees as a result of the connection of the aforesaid properties to the Trunk Line, Authority agrees to pay the same to Snekul until such time as all funds advanced by Snekul to the Authority have been repaid in full or until the termination of this Agreement, as provided in Paragraph 21 hereof. The Authority and/or Town-

ship, however, shall be under no duty or obligation to impose or collect any connection fee against the aforesaid properties.

The authority agreed to solicit bids for the construction of the project. Snekul would then give the authority the approval to proceed, and advance $50,000 to insure that the appellants would be held harmless for any financial loss. In addition, Snekul was to advance to the authority the estimated total cost of the project before the authority was obligated to award the contracts for the project.

On January 13, 1988, the authority passed a resolution charging a one thousand dollar connection charge against the owner of each improved property who connected with the authority's sewer system. However, the authority never assessed this connection charge against owners of improved property within the Snekul tract because Snekul was already paying a one thousand dollar tapping fee pursuant to the 1980 agreement.

The parties worked within the provisions of the 1980 agreement from its inception until December of 1988 when the Pennsylvania Municipalities Planning Code (MPC) was amended.[1] As a result of the amendment, developers installing sanitary sewer lines under the jurisdiction of municipal authorities can no longer post financial security sufficient to ensure the completion and maintenance of the sewer facilities with the municipality. Rather, developers are required to comply with the rules and regulations of each municipal authority. MPC § 509(*l*), 53 P.S. § 10509(*l*).

Accordingly, the parties attempted to make arrangements for a new financial security agreement. On May 23, 1990, the authority's solicitor produced a draft of the financial security agreement. The parties agreed upon the required amount for financial security, but disputed the propriety of introducing a provision imposing "Connection Fees."

1. Pennsylvania Municipalities Planning Code, Act of July 31, 1968, P.L. 805, *as amended, reenacted and amended* by the Act of December 21, 1988, P.L. 1329, 53 P.S. §§ 10101–11202.

Snekul filed a Motion for a Preliminary Injunction and for a Declaratory Judgment ordering the appellants to perform under the terms of the agreement. Then, on June 13, 1990, the authority adopted a resolution amending the January 13, 1988, resolution by increasing the connection charge to $2,000. The authority attempted to apply this increased fee to all owners of improved property that connected to the authority's sewer system, including the owners within the Snekul tract.

The appellants contend that the agreement does not preclude the authority from assessing the additional connection charge against Snekul. Because Snekul is currently paying a $1,000 tapping fee, the extra expense of the connecting charge will increase Snekul's combined fee to $3,000, which is $1,000 more than everyone else living in Cumru pays. The authority has agreed to levy half of the connection charge against the owners in the Snekul tract so that they will bear the same financial burden as other residents under the amended resolution: $2,000.

On July 12, 1990, the trial court issued a mandatory preliminary injunction, directing the appellants to provide Snekul with sanitary sewer service to Phase V of the Overbrook subdivision under the terms set forth in the agreement, and requiring Snekul to deposit with the authority an irrevocable letter of credit in the amount of $100,000 as financial security. In addition, the trial court ordered the authority to issue sewer permits upon payment of $400 per unit, and ordered the township to issue building permits upon compliance by Snekul.

On August 20, 1990, the trial court held oral arguments to determine whether the authority could impose a connection charge on the owners of improved property in the Snekul tract in light of the agreement. The court reached the following relevant conclusions. The court concluded that the agreement was a fully integrated agreement that could not be modified by unilateral actions. The tapping fee provided for in paragraph 21 of the agreement was the exclusive fee to be charged to an owner or developer in the Snekul tract connected to the sewer system. The connection charges passed by resolutions in 1988 and 1990 constituted additional tapping fees, and did not fall within the appellants' discretionary power to impose

sewer "rental rates" or "charges" reserved in paragraph 19 of the agreement. Finally, the trial court found that the connection charge which the authority sought to impose was of the same general character as the tapping fee provided in paragraph 21 of the agreement.

■ Accordingly, the trial court concluded that the appellants are not allowed to circumvent the agreement by imposing a "connection charge" in addition to the tapping fee. The appellants now appeal from the trial court's denial of its exceptions to adjudication and decree nisi, and request that this court dissolve the trial court's injunction and reverse the trial court's judgment for Snekul.[2]

■ The appellants argue that the police powers of the Commonwealth, granted to protect the general welfare and the public interest, cannot be abridged by contract. The appellants, noting that each are municipal authorities subject to the requirements of the Municipality Authorities Act of 1945[3] (the Act), cite the following language in *Latrobe Municipal Authority v. Youngstown Borough Municipal Authority*, 72 Pa.Commonwealth Ct. 84, 94, 456 A.2d 234, 239–240 (1983):

We observe that our reading of the contract is consonant with the principle that, the price charged for utility services having been made the subject of regulations by the state, individuals cannot, by contract, abridge the police powers of the Commonwealth which protect the general welfare and the public interest.... [W]e see no reason why the principle should not apply in the case of municipal authorities whose rates are required by Section 306 B(h) of the Municipality Authorities Act of 1945 to be reviewable and uniform and made subject to review by the common pleas courts....

However, *Latrobe* does not stand for the proposition that the powers of municipalities are not waivable. The language

2. Our scope of review of appeals from the trial court is limited to determining whether the factual findings are supported by substantial evidence and whether the law was properly applied to the facts. *Municipal Authority of the City of Monongahela v. Carroll Township Authority*, 123 Pa.Commonwealth Ct. 615, 555 A.2d 264 (1989).

3. Municipality Authorities Act of 1945, Act of May 2, 1945, P.L. 382, *as amended*, 53 P.S. §§ 301–322.

quoted above does not describe the holding of the *Latrobe* decision, or its analytical structure. Rather, the language relied upon by the authority and the township is dicta, and was designated as such in this court's decision in *Township of Aston v. Southwest Delaware County Municipal Authority*, 112 Pa.Commonwealth Ct. 434, 438, 535 A.2d 725, 727 (1988).

In *Latrobe*, this court interpreted a contract between two municipal authorities in an action for specific performance. Latrobe sold water to Youngstown pursuant to a contract. When Latrobe reclassified its users, it caused Youngstown's rate to increase. This court interpreted the contract to mean that Latrobe must sell water to Youngstown at rates that were in effect at the time of the water's delivery. The court held that

> the contract is not ambiguous ... and that properly interpreted it imposes no restraint on Latrobe's power conferred on it by Section 4B(h) of [the Act, 53 P.S. § 306(B)(h) ] to 'fix, alter, charge and collect rates ... at reasonable and uniform rates to be determined exclusively by it' and in so doing reasonably to classify and reclassify its customers.

*Id.* 72 Pa.Cmwlth.Ct. at 88, 456 A.2d at 237 (citations omitted). Because the language of the *contract* did not inhibit Latrobe's statutory powers, this court upheld Latrobe's exercise of the powers.

Municipal corporations cannot unilaterally escape from contractual obligations when acting as a private entity, even when the public is the primary beneficiary of the endeavor. In the case of *Philadelphia v. Fidelity Philadelphia Trust Co.*, 358 Pa. 155, 163–164, 56 A.2d 99, 102–103 (1947) (citations omitted), the Pennsylvania Supreme Court stated:

> A city acting as a private corporation is subject to the same duties and liabilities as any other private corporation and it cannot violate the obligations of a contract entered into by it in its capacity as a private corporation because it deems it to be for the benefit of its citizens to do so. This court so stated in Western Savings Fund Society v. City of Philadelphia, " '*Any* deviation from its terms, by postponing,

or accelerating the period of performance which it prescribes, imposing conditions not expressed in the contract, or dispensing with the performance of those which are, however minute, or apparently immaterial, in their effect upon the contract of the parties, impairs its obligation.' These principles have been applied to govern the contracts and control the acts of states clothed with all the powers and prerogatives of sovereignty. We see no reason why a municipal corporation, which may be created and destroyed by the state at pleasure, should stand upon higher or better footing than its own creator. Like a state, it has its public duties and its private rights." (Emphasis in original.)

In the present case, the appellants acted as private entities in contracting for the construction of a sewer line for the public's benefit. This court regularly interprets and enforces contracts between municipal corporations and other parties for utility services and for construction of utility services. (*See Latrobe* and *Township of Aston*). The appellants' position that it may unilaterally change its contractual obligations with Snekul is not supported by law.

The appellants also suggest that the trial court's enforcement of the agreement violates article IX, § 9 of the Pennsylvania Constitution by forcing the appellants, in effect, to lend the municipality's credit to a private enterprise. However, this court has held that article IX, § 9 only prohibits municipalities from lending their credit to purely private enterprises. *Sullivan v. County of Bucks*, 92 Pa.Commonwealth Ct. 213, 499 A.2d 678 (1985).

In *Sullivan*, this court interpreted a contract among several municipalities and the Philadelphia Electric Company. The agreement provided for the construction of various water pumping stations to carry water to Bucks and Montgomery Counties, and to provide supplemental cooling water for the Philadelphia Electric Company's (PECO) Limerick nuclear generating station. Bucks County and the Neshaminy Water Resources Authority argued, among other things, that the agreement could not be enforced because it was an improper loan to PECO under article IX. Even though PECO received roughly 48% of the project's ultimate capacity, this court held

that the project and agreement were predominantly for public purposes and did not violate the constitution.

The present case is similar because the construction of the project and the collection system are entirely for the public benefit. The appellants do not allege that the agreement is for the exclusive benefit of Snekul. Nor do the appellants allege that the public receive merely incidental benefits from the performance of the agreement. Therefore, the constitution is not in any danger of violation through enforcement of the agreement.

The next argument forwarded by the appellants is that the trial court erred in concluding that the agreement was an integrated contract. In Pennsylvania written agreements are presumed to be integrated. *Gianni v. Russell and Co.*, 281 Pa. 320, 126 A. 791 (1924). The Supreme Court in *Gianni* adopted the following approach to determine the completeness of a writing:

> [T]he writing will be looked at, and if it appears to be a contract complete within itself, 'couched in such terms as import a complete legal obligation without any uncertainty as to the object or extent of the engagement,' it is conclusively presumed that the whole engagement of the parties and the extent and manner of their undertaking, were reduced to writing.

*Id.* at 323, 126 A. at 792 (quoting *Seitz v. Brewers' Refrigerating Machine Co.*, 141 U.S. 510, 517, 12 S.Ct. 46, 48, 35 L.Ed. 837 (1891)). We note that the appellants have not alleged fraud, accident or mistake in the formation of the agreement. Therefore, the only question for this court regarding the integrated nature of the agreement is whether the trial court based its conclusion on substantial evidence in the record.

In twenty-six clauses, the parties set forth their duties, obligations, definitions and procedures for completing the collection system and the project. The agreement goes into great detail in defining eighteen terms used in the writing, including a two page definition of "Costs". The parties describe consequences of delays and inaction, and detail how monies are to be received, held, allocated and spent.

Although nothing expressly states that the agreement is integrated, the thorough detailing of every aspect of the entire undertaking is sufficient to support the trial court's factual findings and conclusions of law that the agreement is a complete expression of the parties' covenant.

 The appellants also contend that the trial court erred in concluding that the tapping fee was the only charge to be levied against Snekul under the agreement because the agreement provides for the imposition of additional fees on Snekul. Specifically, the appellants cite paragraph 13 of the agreement:

13. When the collection system or portion thereof constructed by Snekul is connected to the Trunk Line as heretofore provided, all owners of Improved Properties connected to the Collection System, directly or indirectly, shall thereupon be required to pay sewer rentals, rates or charges in such amounts and shall be subject to such other charges, fees, ordinances, rules and regulations, as shall be fixed and determined by the Authority and/or the Township."

The appellants argue that this language properly allows it to impose additional fees such as the connecting charge passed by resolution of the authority.

However, the language of the agreement reveals that the parties intended to distinguish between fees born by owners of improved properties and those born by the developers. The two paragraphs which describe the tapping fee are the only paragraphs that mention a fee that is payable by the developer. In contrast, all other paragraphs that discuss fees mention only fees imposed against owners of improved property.

The parties could have included the developer in those other paragraphs but chose not to do so. Paragraph 13 describes the consequences of connecting to the sewer system for owners of improved property, not for developers.

The appellants also contend that the connection charge and tapping fee are separate charges allowed under the agreement and the Act. However, the parties are bound by the agree-

ment, and the agreement burdens Snekul with only the tapping fee.

■ Finally, the appellants argue that upholding the agreement limits the appellants' ability to enforce the township-wide connection charge against Snekul and is therefore discriminatory in Snekul's favor. However, the authority cannot unilaterally pass a resolution that alters the terms of a binding contractual agreement, and then plead that the resolution must be enforced because failure to do so might result in discriminatory behavior.

Accordingly, we affirm the trial court's determination that the agreement provides for only one tapping or connection fee against Snekul properties, and that the municipal corporation is bound by the terms of the agreement.

## ORDER

NOW, December 2, 1992, the order of the Berks County Common Pleas Court, dated April 8, 1991, No. 6067 Equity 1990, is affirmed.