# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

CFR Partners, LP, and CFR : 
Development, Inc., : 
  : 
           Appellants : 
  : 
       v. : No. 676 C.D. 2019
  : Argued: December 12, 2019
Jefferson Codorus Joint Sewer : 
Authority : 

BEFORE:   HONORABLE PATRICIA A. McCULLOUGH, Judge
                 HONORABLE MICHAEL H. WOJCIK, Judge
                 HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE WOJCIK                                  FILED: January 13, 2019

          CFR Partners, LP, and CFR Development, Inc. (collectively, CFR)[1] appeal from a final order of the Court of Common Pleas of York County (trial court) denying CFR's motion for summary judgment and granting Jefferson Codorus Joint Sewer Authority's (Authority) cross motion for summary judgment. CFR contends that the trial court erred in its interpretation of the Municipality Authorities Act (Act)[2] and by determining that the Authority did not engage in ratemaking or feemaking when it entered into a contract with CFR establishing a "Reservation/Tapping Fee." We affirm.

_____

     [1] CFR Partners, L.P., is the successor in interest of CFR Development, Inc. Reproduced Record (R.R.) at 372a.

     [2] 53 Pa. C.S. §§5601-5623.

# I. Background

The salient facts are not in dispute. CFR, a real estate developer, owns an 80-acre tract of land in Codorus Township, York County, Pennsylvania, upon which it is developing a residential subdivision known as "Codorus Estates" (Property). The Authority, a municipal authority created pursuant to the Act, operates a collection, transportation, and disposal system (Sewer System) for portions of Jefferson Borough and Codorus Township, including the Property.

In order to develop the Property, CFR needed to arrange for sewage treatment. CFR initially purchased a private sewage treatment facility to temporarily serve the Property, but the private facility was not large enough to accommodate the proposed 419 Equivalent Dwelling Units (EDUs). Reproduced Record (R.R.) at 376a. Once development of the Property began, CFR entered into a Sewage Capacity Reservation Agreement with the Authority in July 2006 (2006 Agreement), in which it reserved 419 EDUs in the Sewer System at $2,500 per EDU for a total of $1,047,500. R.R. at 401a-11a. In August 2006, the parties also entered into a Construction and Improvements Agreement (Construction Agreement), by which CFR agreed to pay for the construction of certain parts of the Sewer System. R.R. at 413a-14a.

At its September 2008 monthly meeting, the Authority publicly discussed applying for a Pennsylvania Department of Community and Economic Development (DCED) grant to help offset the cost of the construction of the Sewer System. The Authority again discussed the possibility of applying for a grant at its monthly meetings in November and December 2008. At the January 2009 meeting, the Authority, by Resolution No. 2009-01, authorized application for the DCED grant to help offset the cost of the construction of the Sewer System.

2

Following the housing market crash in 2008, CFR determined it did not need the entire amount of EDUs it had reserved in the 2006 Agreement and approached the Authority about renegotiating the terms of the 2006 Agreement. On August 5, 2009, CFR and the Authority entered into a new Sewage Capacity Reservation Agreement (2009 Agreement), by which the parties revoked the 2006 Agreement, modified the Construction Agreement, and agreed to reduce the number of EDUs reserved from 419 to 189 with CFR paying for the cost of such capacity including both the reservation and tapping fees, and its previously agreed upon share of the Sewer System construction costs for the lump sum of $1,100,000, which represented a cost of roughly $5,820.10 per EDU. The 2009 Agreement provided CFR with 20 years to use the reserved sewage capacity instead of the original 10 years contained in the 2006 Agreement. The 2009 Agreement further provided that the Reservation Fee "shall include any charge from the Authority for tapping into the [Sewer] System ('Tapping Fee') and such Tapping Fee for all units of Capacity reserved in this Agreement shall be considered pre-paid." R.R. at 481a. The Authority approved the 2009 Agreement by Resolution No. 2009-07. At this point, the Authority had not passed a resolution at a public meeting establishing a tapping fee for the Sewer System. R.R. at 384a.

At the same time the Authority entered the 2009 Agreement with CFR, the Authority accepted and, thereafter received, the DCED grant in the amount of $3,539,686 to aid in the construction of the Sewer System, which helped to offset construction costs of the Sewer System.[3] The Authority also entered into an

---

[3] DCED awarded the grant about two weeks before the parties entered into the 2009 Agreement. R.R. at 392a. CFR states it was not aware of the DCED grant application and award, even though it had been a topic of discussion at several public meetings. *See* Appellant CFR's Brief at 17.

Amended and Restated Agreement (Codorus Ventures Agreement) with Codorus Ventures, LLC (Codorus Ventures) for the purchase of a wastewater treatment plant on a portion of Codorus Ventures' property in Codorus Township, which was approved by Resolution No. 2009-06. R.R. at 491a-501a, 524a.

Pursuant to the Codorus Ventures Agreement, Codorus Ventures agreed to construct the wastewater treatment plant and dedicate it to the Authority. R.R. at 493a. In exchange, the Authority agreed to reserve 189 EDUs in its Sewer System for Codorus Ventures and not charge it any fees for reserving such capacity. R.R. at 494a-95a. The Authority also agreed to make two payments to Codorus Ventures totaling $3,500,000. R.R. at 493a-94a. The Authority did not charge Codorus Ventures a reservation or tapping fee. R.R. at 490a-511a.

On December 1, 2010, the Authority adopted for the first time a resolution establishing a tapping fee of $1,500 per EDU. R.R. at 549a, 559a-60a, 603a. The Authority did not establish a reservation fee or connection fee.

Upon learning of the tapping fee of $1,500 per EDU, which was significantly less than the $5,820.10 per EDU that CFR agreed to pay pursuant to the terms of the 2009 Agreement, CFR commenced litigation to void the 2009 Agreement, in whole or in part, and in particular, the reservation and tapping fees charged thereunder. In 2011, CFR filed a writ of summons, followed by a complaint in 2013. In Counts 1-10 of the Complaint, CFR claimed that the 2009 Agreement violated the ratemaking and feemaking subsections of the Act by setting reservation and tapping fees. In Count 11, CFR averred that the Authority violated the competitive bidding requirements of Section 5614 of the Act, 53 Pa. C.S. §5614, by entering into a contract for the construction of a wastewater treatment plant without engaging in competitive bidding. On these grounds, CFR sought to rescind the 2009

4

Agreement and requested approximately $560,000 in damages, which it claimed were overpayments paid under the 2009 Agreement.

In response, the Authority filed preliminary objections, which the trial court overruled. The Authority then filed an answer with new matter and a counterclaim, which CFR answered. The Authority responded that the 2009 Agreement was a contract entered into pursuant to its power to contract. The Authority claimed that its power to contract is not limited by the ratemaking and feemaking provisions of the Act, and therefore, the 2009 Agreement is valid and enforceable. The Authority also averred that it did not contract with Codorus Ventures for the construction of the wastewater treatment plant in question, but rather contracted to purchase an already completed wastewater treatment plant, which did not trigger the competitive bidding requirements of the Act.

At the close of discovery, the parties filed cross motions for summary judgment. The crux of Counts 1 through 10 was whether the Authority's power to contract is separate and distinct from its ratemaking and feemaking powers. The trial court examined Section 5607 of the Act, 53 Pa. C.S. §5607, and engaged in statutory interpretation.

Section 5607 governs municipal authorities' purposes and powers, and provides, in pertinent part:

> (d) Powers.--Every authority may exercise all powers necessary or convenient for the carrying out of the purposes set forth in this section, including, but without limiting the generality of the foregoing, the following rights and powers:
> * * *
> (13) To make contracts of every name and nature and to execute all instruments necessary or convenient for the carrying on of its business.

5

\* \* \*

(24) To charge enumerated fees to property owners who desire to or are required to connect to the authority's sewer or water system. Fees shall be based upon the duly adopted fee schedule which is in effect at the time of payment and shall be payable at the time of application for connection or at a time to which the property owner and the authority agree. In the case of projects to serve existing development, fees shall be payable at a time to be determined by the authority. An authority may require that no capacity be guaranteed for a property owner until the tapping fees have been paid or secured by other financial security. The fees shall be in addition to any charges assessed against the property in the construction of a sewer or water main by the authority under paragraphs (21) and (22) as well as any other user charges imposed by the authority under paragraph (9), except that no reservation of capacity fee or other similar charge shall be imposed or collected from a property owner who has applied for service unless the charge is based on debt and fixed operating expenses. A reservation of capacity fee or other similar charge may not exceed 60% of the average sanitary sewer bill for a residential customer in the same sewer service area for the same billing period. Any authority opting to collect a reservation of capacity fee or other similar charge may not collect the tapping fee until the time as the building permit fee is due. Tapping fees shall not include costs included in the calculation of any other fees, assessments, rates or other charges imposed under this act.

\* \* \*

(ii) Every authority charging a tapping, customer facilities or connection fee shall do so only pursuant to a resolution adopted at a public meeting of the authority. The authority shall have available for public inspection a detailed itemization of all calculations, clearly showing the maximum fees allowable for each part of the tapping fee and the manner in which the fees were determined, which shall be made a part of any resolution imposing such fees. A tapping, customer facilities or connection fee *may be revised and imposed* upon those who subsequently connect to the system, subject to the provisions and limitations of the act.

6

> (iii) *No authority shall have the power to impose a connection fee, customer facilities fee, tapping fee or similar fee except as provided specifically under this section.*

53 Pa. C.S. §5607(d)(13), (24)(ii), (iii) (emphasis added). The trial court concluded that Section 5607 of the Act was clear and free from ambiguity and did not contain language that would indicate that an authority's power to contract is limited by the ratemaking and feemaking provisions. The trial court explained that the Act grants an authority the power to enter into contracts and that such power is "separate, distinct and not limited by the ratemaking and feemaking provisions" of the Act. Trial Court Op., 5/3/19, at 16. The trial court determined that the ratemaking and feemaking are "unilateral actions," whereas the contract is negotiated by both sides. *Id.*

The trial court then examined the 2009 Agreement. Upon finding an offer, acceptance and consideration, the trial court determined the 2009 Agreement was a valid and enforceable contract. The trial court also noted that the parties negotiated the terms of the 2009 Agreement. In fact, the 2009 Agreement is the result of the parties renegotiating the terms of the 2006 Agreement.

As for Count 11, the competitive bidding count, the trial court examined Section 5614 of the Act, which requires competitive bids for "all construction, reconstruction, repair or work of any nature made by an authority." 53 Pa. C.S. §5614. The trial court determined that competitive bidding was not required because, according to the Codorus Ventures Agreement, the Authority did not undertake the duty to manage or construct the wastewater treatment plant.[4] Thus, the trial court determined that the Authority was entitled to summary judgment on

---

[4] CFR does not challenge the trial court's disposition of Count 11 in this appeal.

7

all counts. By order dated May 2, 2019, the trial court denied CFR's motion for summary judgment and granted the Authority's cross motion. This appeal now follows.[5]

## II. Issues

On appeal, CFR contends that the trial court erred by holding that the Authority's general power to enter into contracts under the Act is "separate, distinct, and not limited by" the specific ratemaking and feemaking provisions in the Act, when the particular controls the general whenever there is a conflict between a general and special provision in the same statute, and the clause last in order of date or position controls whenever two or more clauses in the same statute are irreconcilable. CFR maintains the trial court also erred by holding that the Authority did not engage in ratemaking or feemaking when it entered into a contract, which expressly established a "Reservation/Tapping Fee."[6]

## III. Discussion
### A. Statutory Construction of Section 5607 of the Act

CFR contends that the trial court erroneously interpreted the Act when it held that the Authority's general power to enter into contracts under the Act is "separate, distinct, and not limited by" the specific ratemaking and feemaking

---

[5] Our standard of review of a trial court's decision granting or denying summary judgment is *de novo* and our scope of review is plenary. *Pyeritz v. Commonwealth*, 32 A.3d 687, 692 (Pa. 2011).

[6] Although CFR still maintains that the Authority violated the competitive bidding requirements of the Act, *see* Appellant CFR's Brief at 18 n.9, CFR did not identify this issue in its statement of questions presented or otherwise develop argument on this issue in its brief. *See id. generally*. Therefore, this issue is waived on appeal. *See Department of Environmental Protection v. Green 'N Grow Composting, LLC*, 201 A.3d 282, 286 (Pa. Cmwlth. 2018) (argument waived where not sufficiently developed to allow meaningful review on appeal); *see also* Pa. R.A.P. 2116(a), 2119(a).

provisions in the Act. Although subsection 5607(d)(13) empowers a municipal authority to make contracts in a scant 23 words, subsection (d)(24), in far more specific and detailed terms, excludes "the power to impose a connection fee, a customer facilities fee, tapping fee or similar fee except as provided specifically under this section." 53 Pa. C.S. §5607(d)(24)(iii). To the extent subsections (d)(13) and (d)(24) conflict with one another, the more specific subsection ((d)(24)) controls over the more general ((d)(13)). Also, subsection (d)(24) appears later in order of the position in the Act and was enacted at a later time, which is further support that (d)(24) controls over (d)(13). These provisions must be read *in pari materia*. According to CFR's interpretation, subsection (d)(24)'s explicit prohibition against ratemaking and feemaking limits the Authority's ability to enter contracts in this regard. Under the trial court's interpretation, (d)(24) is rendered essentially meaningless. By failing to apply the foregoing canons of statutory construction and reconcile the explicit prohibition against ratemaking and feemaking, CFR claims that the trial court erred.

In considering a question of statutory construction, we are guided by the Statutory Construction Act of 1972 (Statutory Construction Act).[7] The object of statutory construction is to ascertain and effectuate legislative intent. Section 1921(a) of the Statutory Construction Act, 1 Pa. C.S. §1921(a); *Whitmoyer v. Workers' Compensation Appeal Board (Mountain Country Meats)*, 186 A.3d 947, 954 (Pa. 2018). In pursuing that end, we are mindful that a statute's plain language generally provides the best indication of legislative intent. *Whitmoyer*, 186 A.3d at 954; *Commonwealth v. McClintic*, 909 A.2d 1241, 1243 (Pa. 2006). Thus, statutory construction begins with examination of the text itself. *Southeastern Pennsylvania*

---

[7] 1 Pa. C.S. §§1501-1991.

*Transportation Authority v. Holmes*, 835 A.2d 851, 856 (Pa. Cmwlth.), *appeal denied*, 848 A.2d 930 (Pa. 2003).

"[W]e are instructed to give the statute its obvious meaning whenever the language is clear and unambiguous." *Whitmoyer*, 186 A.3d at 954 (citing 1 Pa. C.S. §1921(b)). "To that end, we will construe words and phrases according to their common and approved usage." *Id.* (citing Section 1903 of the Statutory Construction Act, 1 Pa. C.S. §1903(a)). "Further, every statute shall be construed, if possible, to give effect to all its provisions so that no provision is 'mere surplusage.'" *Id.* (citing 1 Pa. C.S. §1921(a)); *Malt Beverage Distributors Association v. Pennsylvania Liquor Control Board*, 918 A.2d 171, 175-76 (Pa. Cmwlth. 2007), *aff'd*, 974 A.2d 1144 (Pa. 2009). Moreover, we are to assume the General Assembly did not intend a result that is "absurd, impossible of execution or unreasonable." Section 1922(1) of the Statutory Construction Act, 1 Pa. C.S. §1922(1).

When there are conflicts between statutory provisions, we are mindful of the maxim that the particular controls the general:

> Whenever a general provision in a statute shall be in conflict with a special provision in the same or another statute, the two shall be construed, if possible, so that effect may be given to both. If the conflict between the two provisions is irreconcilable, the special provisions shall prevail and shall be construed as an exception to the general provision.

1 Pa. C.S. §1933. Further, whenever clauses within the same statute are irreconcilable, the clause last in order of date or position shall prevail. 1 Pa. C.S. §§1934, 1935.

10

In relying on these principles of statutory construction, CFR argues that the special subsection (d)(24), which is more particular as well as last in order of date and position, must prevail over the general contract provision of subsection (d)(13). CFR's argument fails for several reasons.

First, CFR assumes that these sections are in conflict and that both provisions cannot be given effect. CFR argues that the Authority's power "[t]o make contracts of every name and nature and to execute all instruments necessary or convenient for the carrying on of its business" ((d)(13)) is limited by the Authority's power "[t]o charge enumerated fees to property owners who desire to or are required to connect to the authority's sewer or water system" ((d)(24)).

Based upon a plain reading of the Act, we perceive no inherent conflict between an authority's broad power to contract and its power to impose rates and fees. Nevertheless, to the extent a conflict exists, the conflict is far from irreconcilable. Both provisions of the Act may be given effect as required by Section 1933 of the Statutory Construction Act because subsection (d)(13) empowers an authority to contract, while subsection (d)(24) governs an authority's power to *unilaterally* impose fees. Although "[n]o authority shall have the power to impose a connection fee, customer facilities fee, tapping fee or similar fee except as provided specifically under this section," 54 Pa. C.S. §5607(24)(iii), by entering the contract with CFR, the Authority did not unilaterally "impose" any fee on CFR. Rather, the parties negotiated and reached a mutually acceptable agreement regarding the fees.

Contrary to CFR's position, allowing municipal authorities to contract in this manner is hardly absurd. The General Assembly clearly wanted to restrict an authority's ability to *impose* a fee on a "residential customer,"[8] but it did not limit an

---

[8] A "residential customer" includes those developing property for residential dwellings that require multiple tapping fee permits. 53 Pa. C.S. §5607(24)(v).

authority's power to *contract* for the same. Further contrary to CFR's position, subsection (d)(24) is not rendered essentially meaningless by such an interpretation. Although authorities may not "impose" fees except as provided for under the section; they are free to enter a contract for such fees. 54 Pa. C.S. §5607(d)(13), (24).

Moreover, Pennsylvania courts have long distinguished contractual agreements from administratively charging fees in similar contexts. In *Township of Aston v. Southwest Delaware County Municipal Authority*, 535 A.2d 725 (Pa. Cmwlth. 1988), Aston Township sought to set aside a sewage treatment contract between an authority and a neighboring township. The contract set the neighboring township's rate at $23.85 while residents within Aston Township and authority's service area paid approximately $80.00 per year per EDU. Aston Township argued that the contract violated the Act's predecessor law, the Municipality Authorities Act of 1945 (1945 Act),[9] which required the authority to establish reasonable and uniform rates for all users. We determined that the authority could contract with another municipal body to provide sewer service for a different rate. We recognized that there was inherent tension between the statute requiring uniform rates and the authority's power to fix rates. We explained:

> The discrepancy is not illogical when the difference between the two situations is examined. In the first case, under Section 4 B(h) [*formerly* 53 P.S. §306 B(h)], a municipal authority is granted the exclusive authority to set rates for its services. *The recipient of these services has no input into the rate-making process. It is therefore protected by the provision requiring the rates to be reasonable and uniform and subject to judicial review. Such is not the case when two municipal bodies contract for services, as under Section 4 B(p) [formerly 53*

---

[9] Act of May 2, 1945, P.L. 382, *as amended*, *formerly* 53 P.S. §§301-322, repealed by the Act of June 19, 2001, P.L. 287. The Act codified the 1945 Act.

> P.S. §306 B(p)]. That section allows a municipal authority to fix the rate for its services, but that rate, of course, *will be the subject of negotiation before a contract is concluded*. There is nothing in the statute to prevent the inclusion of a clause providing for periodic rate increases and, *conversely, nothing to prohibit setting a maximum rate*. Hence, under Section 4 B(p), legal authority exists for the . . . contract.

*Aston*, 535 A.2d at 728 (emphasis added).

Further, municipal authorities are bound by the terms of a contract with a private entity, even if that contract establishes disparate fees. *See Cumru Township Authority v. Snekul, Inc.*, 618 A.2d 1080 (Pa. Cmwlth. 1992). In *Cumru*, the municipal authority signed a contract with the developer, fixing the developer's combined tapping and connection fees at $2,000 for land within the authority's boundaries. *Id.* at 1083. After the authority voted to raise fees for all residents and attempted to collect the increased fees from the developer, the developer sued. This Court held that the authority's contract with a private developer prevented it from charging the developer a higher fee, which would have been uniform throughout the authority's area. We reasoned that municipal corporations cannot unilaterally escape contractual obligations when acting as a private entity, even when the public is the primary beneficiary of the endeavor. *Id.* at 1084. Although these cases dealt with different subsections under the prior law, the underlying rationale is equally applicable under the current Act.

For these reasons, we conclude that the trial court properly interpreted the Act and did not err in determining that the Authority's express power to enter into a contract under Section 5607(d)(13) of the Act is not limited by the Authority's powers to set rates for its services under subsection (d)(24).

**B. 2009 Agreement**

Next, CFR contends that the trial court erred when it determined that the Authority did not engage in ratemaking or feemaking when it executed the 2009 Agreement. The Act states that a municipal authority can charge a tapping fee "only pursuant to a resolution adopted at a public meeting of the authority," and that "[n]o authority shall have the power to impose a connection fee, customer facilities fee, tapping fee or similar fee except as provided specifically under this section." 53 Pa. C.S. §5607(d)(24)(ii), (iii). The 2009 Agreement clearly provides that the $1,100,000 the Authority charged CFR is a "Reservation/Tapping Fee." Thus, the Authority clearly violated the Act by charging a tapping fee pursuant to a contract.

As discussed above, the power to impose rates and fees is different from the power to contract. CFR willingly entered into the 2009 Agreement with the Authority in order to secure sewer service for its development. If CFR did not like the terms of the contract, it was free to renegotiate or refuse to enter the contract. As the trial court noted, CFR renegotiated the terms of the 2006 Agreement when it determined it did not need the same EDU capacity as previously contracted.

Although CFR now claims that it had "no choice" but to enter the agreement, R.R. at 377a, the evidence indicates otherwise. At the time CFR made the deal, the Authority had not passed a resolution at a public meeting establishing a tapping fee for the Sewer System. R.R. at 384a, 389a. CFR's General Partner, René de Brabander, believed the 2009 Agreement to be a "good deal." R.R. at 385a. In fact, CFR "assum[ed]" the future tapping fee "was going to be a lot more money . . ." because such fees were higher in other townships. R.R. at 384a-85a. Further, and perhaps more importantly, the 2009 Agreement enabled CFR to move forward with development. R.R. at 385a. CFR had a contract with Ryan Homes to deliver the lots by a date certain, and CFR needed to ensure that the homes built on those

14

lots had capacity in the Sewer System. R.R. at 385a. Therefore, CFR chose not to wait to deliver the lots until the Authority established a tapping fee through the proper procedures set forth in the Act. R.R. at 385a. Indeed, CFR and the Authority entered into the 2009 Agreement in August 2009, but the Authority did not establish a tapping fee for the Sewer System until December 1, 2010 – over a year later. R.R. at 479a, 549a.

Upon review, CFR willingly entered into the 2009 Agreement, which fully served its purposes at the time. It was only after the Authority adopted its resolution setting the EDUs at $1,500 per unit that CFR wanted to void the 2009 Agreement. It appears that CFR now suffers from buyer's remorse. However, buyer's remorse does not constitute sufficient legal grounds for setting aside an otherwise valid contract.

Accordingly, we affirm.


_____
MICHAEL H. WOJCIK, Judge


Judge Brobson did not participate in the decision of this case.

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

CFR Partners, LP, and CFR : 
Development, Inc., : 
 : 
 Appellants : 
 : 
 v. : No. 676 C.D. 2019
 : 
Jefferson Codorus Joint Sewer : 
Authority : 

## O R D E R

AND NOW, this 13th day of January, 2020, the order of the Court of Common Pleas of York County, filed May 3, 2019, is AFFIRMED.

_____
MICHAEL H. WOJCIK, Judge